[No. C057018. Third Dist. Mar. 24, 2009.]

CALIFORNIA NATIVE PLANT SOCIETY, Plaintiff and Appellant, v. CITY OF RANCHO CORDOVA et al., Defendants and Appellants; JAEGER ROAD 530, LLC, Real Party in Interest and Appellant.

■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■

COUNSEL

Kenyon Yeates, Charity Kenyon, J. William Yeates, Jason R. Flanders; Lippe Gaffney Wagner and Keith G. Wagner for Plaintiff and Appellant.

Meyers, Nave, Riback, Silver & Wilson, Adam U. Lindgren, Julia L. Bond and Edward Grutzmacher for Defendants and Appellants.

Remy, Thomas, Moose and Manley, James G. Moose, Sabrina V. Teller and Jason W. Holder for Real Party in Interest and Appellant.

OPINION

**ROBIE, J.**—In this mandamus action brought by plaintiff California Native Plant Society (the Society), the trial court directed defendants City of Rancho Cordova and Rancho Cordova City Council (jointly the City) to set aside two resolutions and two ordinances relating to a residential and commercial development project known as the Preserve at Sunridge (the Project). The trial court found the City's certification of the environmental impact report (EIR) for the Project and approval of the Project violated the California Environmental Quality Act (CEQA; Pub. Resources Code,[1] § 21000 et seq.): (1) "by improperly deferring mitigation of impacts on vernal pool and wetland habitat and associated animal species"; (2) because the "findings [in the EIR] that impact on vernal pool and wetland habitat and associated animal species had been mitigated to less than significant levels [we]re not supported by substantial evidence"; and (3) "because the EIR failed to disclose the potentially significant impact of the water supply plans for the project on fish migration in the Cosumnes River." The trial court also found the approval of the Project violated the Planning and Zoning Law (Gov. Code,

---

[1] All further statutory references are to the Public Resources Code unless otherwise indicated. We will refer to the CEQA statutes in the format CEQA, section ___.

§ 65000 et seq.) because the Project was "not consistent with, and d[id] not comply with, mandatory requirements of [the City]'s General Plan regarding interconnection of preserved habitat areas that support special-status plant and animal species, and regarding mitigation on such species to ensure that the project does not contribute to the decline of the affected species population."

On the appeal by the City and real party in interest Jaeger Road 530, LLC (Jaeger), and the cross-appeal by the Society, we will conclude the trial court did not err in finding the approval of the Project violated the Planning and Zoning Law because, as we will explain, the City's general plan required the City to design mitigation for impacts of the Project on special-status species in coordination with the United States Fish and Wildlife Service (the Service), which the City did not do. The trial court did err, however, in finding the City violated CEQA in preparing the EIR and approving the Project. Accordingly, we will reverse the judgment and instruct the trial court to enter a new and different judgment consistent with our decision.

FACTUAL AND PROCEDURAL BACKGROUND

*The Project*

The Project involves the development of an approximately 530-acre site in the southeastern portion of the City that is to include "single-family residential, multi-family residential, commercial and office uses, a neighborhood park, an elementary school, detention/water quality basins, an open space/wetland preserve, pedestrian facilities, bikeways, parkways, and drainage corridors." The Project site lies in the center of a master planned community known as Sunrise Douglas, which was the subject of a community plan (the Sunrise Douglas Community Plan) approved by Sacramento County. (See *Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 421–422 [53 Cal.Rptr.3d 821, 150 P.3d 709] (*Vineyard*).)

The Project site "is located within the Laguna Formation Geological Formation in the Southeastern Sacramento Valley Vernal Pool Region." Vernal pools are "seasonally inundated shallow depressions underlain by an impermeable layer of soil, generally hardpan or bedrock . . . . The pools are inundated with water for various periods of times [*sic*] depending on the depression depth, extent and duration of rainfall, and ambient temperatures." "The vernal pools on the site are classified as northern hardpan vernal pools" and they "support a variety of invertebrate species that are adapted to seasonal inundation and climatic regime associated by this habitat . . . ."

A large "unnamed ephemeral drainage" way that is "a headwater tributary to Morrison Creek" runs through the Project site.[2] "This drainage typically functions in the collection and transport of stormwater and convey flows during and immediately after storm events." "Depressional areas occur within the reach of the drainage where water pools and remains after the primary channel is dried. These depressional areas support vernal pool and seasonal wetland vegetation in the spring" and provide habitats for two species of vernal pool crustaceans—vernal pool fairy shrimp and vernal pool tadpole shrimp—that are listed as threatened and endangered (respectively) under the federal Endangered Species Act of 1973 (16 U.S.C. § 1531 et seq.).[3] Vernal pool tadpole shrimp were actually "observed in some of the deeper on-site pools during . . . surveys" in 2002 and 2005, and vernal pool fairy shrimp "have been documented within vernal pools in the immediate project vicinity."

### *The Federal Agencies' "Conceptual-Level Strategy"*

In the spring of 2004, three federal agencies—the Service, the United States Environmental Protection Agency (USEPA), and the United States Army Corps of Engineers (the Corps)—"met to formulate a conceptual-level strategy for avoiding, minimizing, and preserving aquatic resource habitat in the Sunrise-Douglas Community Plan Area." According to the agencies' strategy document, these meetings resulted in the identification of "preserve areas" within the Sunrise Douglas Community Plan area that were "predicated on ten principles and standards that would be followed by developers and planners as each element of the overall development proceeds." Further, the agencies' strategy document provided that "[t]he mapped boundaries [of these preserve areas were] the smallest that would be acceptable to the Agencies . . . ." The document also provided as follows: "The conceptual level strategy should be used by developers and planners to design and plan projects in the [Sunrise Douglas Community Plan area]. The Agencies will use the strategy to aid in the review of proposed development and evaluate the probable individual and cumulative effects on aquatic resources and sensitive species."[4]

---

[2] Commonly the papers connected with the Project refer to this tributary *as* Morrison Creek.

[3] Both species of vernal pool shrimp subsist in three habitat types found in the Project area—vernal pool, depressional seasonal wetland, and riverine seasonal wetland—while the vernal pool tadpole shrimp also subsists in a fourth habitat type—ephemeral drainage.

"These crustaceans . . . hatch from hard-shelled eggs after winter rains fill the pools, and are present as adults for only one to four months. As the pools dry, the shrimp reproduce and die, leaving eggs for the following year. Widespread agricultural and urban development has reduced the number of vernal pools in the valley, and is the primary cause of these species' endangerment."

[4] Jaeger requests that we take judicial notice of a "joint rule" adopted by the Corps and USEPA in April 2008 regarding "Compensatory Mitigation for Losses of Aquatic Resources." In Jaeger's view, "The Joint Rule . . . tends to prove . . . that the mitigation measures for

*The Notices of Preparation and Initial Comments*

In September 2004, the City issued notice of its intent to prepare an EIR for the Project. In response, the Service submitted a comment letter. The Service referred extensively to the conceptual-level strategy document it had developed earlier that year in conjunction with USEPA and the Corps, then stated as follows: "Based on our review of the proposal submitted by the project proponent, the project design for the [Project] is not consistent with our conceptual-level strategy document and the map. The proposal would result in significant impacts to, and loss of, vernal pool tadpole shrimp [and] vernal pool fairy shrimp . . . and the habitats they depend on (grasslands, wetlands and vernal pools). In addition, the proposal would result in the realignment of Morrison Creek for much of its length in the project site. This action will result in significant changes and impacts to the overall hydrology of the area which will, in turn, adversely impact endangered species habitat. We strongly recommend that the . . . [P]roject, and all future projects, in the [Sunrise Douglas Community Plan area] be designed consistent with the strategy discussed here."

*The Draft EIR*

The City released the draft EIR for comment in October 2005. In its assessment of impacts on biological resources, the draft EIR noted the Project would "result in the direct loss of 14.1 acres of vernal pool fairy shrimp habitat" and "15.65 acres of vernal pool tadpole shrimp habitat."[5] The draft EIR deemed the loss of this habitat significant. The draft EIR further provided that these direct impacts would be mitigated "in such a manner that there will be no net loss of habitat (acreage and function) for these species in the Laguna Formation following implementation of the project." To achieve this and thereby reduce the impact of the Project to less than significant, the applicant would be required to "complete and implement a habitat mitigation and monitoring plan that will compensate for the loss of acreage, function and value of the impacted resources." (This mitigation requirement is referred to as mitigation measure 4.9.1b.) Generally, the plan would require the applicant to preserve two acres of existing habitat or create one acre of new habitat for each acre of habitat impacted by the Project. The plan would have to include "[t]arget areas for creation, restoration and preservation," "[a] complete biological assessment of the existing resources on the target areas,"

---

impacts to wetlands described in the EIR and adopted by the City may ultimately be acceptable to the Corps and the EPA." As this point, even if true, has no bearing on our decision, we deny the request for judicial notice.

[5] The draft EIR also noted the Project would result in the long-term preservation of 5.61 acres of habitat for both species.

"[s]pecific creation and restoration plans for each target area," and "[p]erformance standards for success that will illustrate that the compensation ratios are met."

In addition to noting the direct loss of habitat for both species of vernal pool shrimp, the draft EIR also noted the Project would have indirect adverse effects on the habitat for these species, both "in the on-site preserve and adjacent off-site habitat areas," which would be significant.[6] Specifically, "Alternation of current inundation and desiccation regimes due to altered hydrology [resulting from the creation of impervious surfaces and the redirection of stormwater flows] could substantially alter the characteristics of vernal pool habitat, resulting in [the] loss or degradation of [that] habitat." To mitigate these indirect effects, the applicant would be required (among other things) to adhere to the same 2-1/1-1 preservation/creation requirement under the same mitigation and monitoring plan imposed to mitigate the direct loss of habitat from the Project. (This mitigation requirement is referred to as mitigation measure 4.9.2a.)

The draft EIR noted the Project would result in a significant impact to the northern hardpan vernal pool community, consisting of a direct loss of 10.46 acres of such pools as well as indirect effects on such pools. The draft EIR noted that implementation of several already-identified mitigation measures, including 4.9.1b and 4.9.2a, would reduce the impact to less than significant.

The draft EIR also noted the Project would result in a significant impact due to the loss of 15.65 acres of "waters of the US."[7] This impact was to be mitigated by "plans for the creation of jurisdictional waters at a mitigation ratio no less than 1:1 acres of created waters to each acre filled." This mitigation measure (4.9.5a) could be satisfied by the vernal pool and seasonal wetland mitigation pursuant to mitigation measure 4.9.1b.

### Comments on the Draft EIR

The Service submitted a comment letter on the draft EIR directing the City's attention back to the Service's letter of October 2004 in response to the notice of preparation of the EIR. The Service noted that with respect to the vernal pool fairy and tadpole shrimp (and two special-status species of

---

[6] The "on-site preserve" is an approximately 90-acre open space/wetland preserve located in the southwest portion of the Project site, which would apparently include the 5.61 acres of habitat for the vernal pool fairy shrimp and tadpole shrimp to be preserved as part of the Project.

[7] The phrase "waters of the US" (sometimes "jurisdictional waters") refers to "wetlands and other water bodies that fall under the jurisdiction of the United States Army Corps of Engineers."

grass), "we cannot discern any changes to the proposal which would reduce impacts to these species, thus our previous comments are pertinent."

In its own comment letter on the draft EIR, the Society asserted the mitigation and monitoring plan proposed as mitigation measure 4.9.1b would "also have environmental impacts but these are not addressed in the DEIR. Additionally, committing to the preparation of a document does not constitute mitigation. In order for the public to be fully informed of the environmental consequences (both positive and negative) of this proposed project, the DEIR should identify the proposed mitigation site and discuss the environmental impacts associated with the proposed mitigation and monitoring plan." The Society also asserted its belief "that creation of artificial vernal pools within an existing intact vernal pool grassland ecosystem is actually a negative environmental impact upon that natural system. Additionally, we are concerned that creation or restoration of mitigation vernal pools could have significant negative impacts upon the ecosystem as a whole." The Society offered a similar comment to mitigation measure 4.9.5a.

### The Final EIR and Approval of the Project

In response to the Society's comments, the City added a new mitigation measure (4.9.2c) in the final EIR. The purpose of this new measure was to "address[] the potential impacts of the proposed off-site creation activities" so as to "ensure that the biological impacts are reduced to less than significant." Among other things, this new measure required the applicant to submit a wetland "Avoidance/Mitigation Plan," which would include "[t]he location of the proposed vernal pool and seasonal wetland habitat site(s) . . . to be created to ensure no net loss in wetland habitat acreage, values and functions," "a monitoring plan to assess whether the compensation wetlands are functioning as intended," and "a maintenance plan for the wetland preservation/mitigation areas describing the measures to be implemented to assure that they are maintained as wetland habitat in perpetuity."

In July 2006, the City adopted resolutions certifying the EIR for the Project and approving an amendment to certain mitigation measures in the Sunrise Douglas Community Plan. The City specifically found the Project was consistent with its new general plan.

In August 2006, the City adopted a resolution approving a tentative subdivision map for the Project, an ordinance amending the zoning for the area of the Project, and an ordinance approving the development agreement between the City and Jaeger. The City specifically found the tentative map, the rezoning, and the development agreement were consistent with the City's general plan.

*Proceedings in the Trial Court*

In September 2006, the Society filed a petition for writ of mandate alleging violation of CEQA. In November, the Society filed an amended petition alleging violations of CEQA and the Planning and Zoning Law. Later, the Society filed a second amended petition that contained four causes of action asserting violations of CEQA and one cause of action asserting violation of the Planning and Zoning Law.

The Society's arguments in support of its petition, and the City's responses to those arguments, will be described in detail in the discussion to come. For now, suffice it to say that while the trial court rejected some of the Society's arguments and found some were not preserved for review by the exhaustion of administrative remedies, the court nonetheless granted judgment in favor of the Society, finding that the City's approval of the Project and certification of the EIR violated CEQA and that the approval of the Project also violated the Planning and Zoning Law. The City and Jaeger filed a timely appeal, and the Society filed a timely cross-appeal.[8]

DISCUSSION

I

*CEQA Issues*

A

*Standard and Scope of Review*

In CEQA cases a court decides whether "the agency has not proceeded in a manner required by law" and "the act or decision is supported by substantial evidence in the light of the whole record." (CEQA, §§ 21168.5, 21168; see *Neighbors of Cavitt Ranch v. County of Placer* (2003) 106 Cal.App.4th 1092, 1099–1100 [131 Cal.Rptr.2d 379].) "The agency is the finder of fact and we must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor

---

[8] Following the completion of briefing, the Society filed a motion to "strike new evidence and argument presented for first time in" the City's and Jaeger's reply briefs or for permission to file a surreply. Because it does not appear any of the "new evidence and argument" about which the Society complains was material to our decision, the Society's motion is denied.

of the agency's decision." (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 117 [104 Cal.Rptr.2d 326].) Accordingly, the burden is on the challenger. (*Barthelemy v. Chino Basin Mun. Water Dist.* (1995) 38 Cal.App.4th 1609, 1617 [45 Cal.Rptr.2d 688].) "The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo." (*Vineyard, supra,* 40 Cal.4th at p. 427.)

B

*Offsite Mitigation*

In the trial court, the Society argued the EIR violated CEQA because it "failed to describe . . . where off-site vernal pool and wetland creation may occur, or how such activities may affect these undescribed off-site environments." The Society contended that by failing to identify where the offsite mitigation might occur, the EIR (1) failed to establish an accurate, stable, and finite description of the Project; and (2) failed to describe the environment that might be affected by the offsite mitigation. The Society also contended the new mitigation measure (4.9.2c) added in the final EIR "unlawfully segments, or 'piecemeals,' environmental review for the 'whole' of the . . . project." In addition, the Society contended the City had "unlawfully deferred development and adoption of mitigation measures until after project approval" by failing to describe where the offsite mitigation might occur and failing to analyze or disclose the impacts of that mitigation. Finally, the Society contended the City had violated CEQA by failing to recirculate the draft EIR after adding the new mitigation measure.

The Society also argued the City's finding, that the vernal pool and seasonal wetland mitigation measures provided for in the EIR would reduce the impact of the Project on these habitats to less than significant, was not supported by the evidence.

In its opposition, the City argued (among other things) that the Society had failed to exhaust its administrative remedies because it had failed to raise any of these arguments in the administrative proceedings.

The trial court determined the Society's letter commenting on the draft EIR was sufficient to exhaust administrative remedies on two of the arguments relating to offsite mitigation: (1) "whether mitigation of impacts on vernal pools, wetlands, and associated animal species, improperly [were] deferred"

and (2) "whether the finding that proposed off-site mitigation measures would reduce the impacts on vernal pools to a 'less than significant level' was supported by substantial evidence." The court further concluded, however, that administrative remedies had not been exhausted on the issues of whether the City was required to recirculate the draft EIR after adding the new mitigation measure and whether the City's "handling of proposed off-site mitigation made the EIR deficient in its description of the project, in its description of the environmental background of the project, or in the sense that the project was being improperly 'piecemealed.' "

On the merits of the issues the trial court found were properly raised, the court agreed with the Society. The court concluded the "proposed mitigation plan for addressing the loss of vernal pool and wetlands habitat on the project site . . . suffers from flaws in two areas which prevent it from complying with the rules for acceptable deferred mitigation." First, "the mitigation plan does not identify any particular locations in the Laguna Formation Area at which replacement vernal pools and wetlands may be constructed, or give any reasonable assurance, or even expectation, that such locations can and will be acquired and used for such purposes." Second, "the mitigation plan lacks appropriate standards and criteria applicable to its goal of replacing lost habitat with functioning new vernal pools and wetlands. . . . The mitigation plan as it stands thus lacks the kind of specific performance criteria that are necessary for proper deferred mitigation." As a consequence of its finding of improper deferred mitigation measures, the trial court also concluded the City's "findings that impacts have been reduced to the level of 'less than significant' based on those measures are not supported by substantial evidence."

On appeal, the City and Jaeger contend the trial court erred in concluding the City improperly deferred mitigation and that substantial evidence does not support the City's finding that offsite mitigation will reduce the impact of the Project on the vernal pool and seasonal wetland habitats to less than significant.

In its cross-appeal, the Society asserts the trial court erred in concluding administrative remedies were not exhausted on the Society's four other arguments relating to offsite mitigation.

We begin with the exhaustion issue.

1. *Exhaustion of Administrative Remedies*

■ " 'Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action.' [Citation.] Subdivision (a) of CEQA

section 21177 sets forth the exhaustion requirement [the trial court applied] here. That requirement is satisfied if 'the alleged grounds for noncompliance with [CEQA] were presented . . . by any person during the public comment period provided by [CEQA] or prior to the close of the public hearing on the project before the issuance of the notice of determination.' " (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 791–792 [39 Cal.Rptr.3d 189], fn. & italics omitted.)

"The purpose of the rule of exhaustion of administrative remedies is to provide an administrative agency with the opportunity to decide matters in its area of expertise prior to judicial review. [Citation.] The decisionmaking body ' "is entitled to learn the contentions of interested parties before litigation is instituted." ' " (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 384 [110 Cal.Rptr.2d 579].)

To exhaust administrative remedies, "[m]ore is obviously required" than "generalized environmental comments at public hearings." (*Coalition for Student Action v. City of Fullerton* (1984) 153 Cal.App.3d 1194, 1197 [200 Cal.Rptr. 855].) "On the other hand, less specificity is required to preserve an issue for appeal in an administrative proceeding than in a judicial proceeding. This is because ' "[i]n administrative proceedings, [parties] generally are not represented by counsel. To hold such parties to knowledge of the technical rules of evidence and to the penalty of waiver for failure to make a timely and specific objection would be unfair to them." [Citation.] It is no hardship, however, to require a layman to make known what facts are contested.' " (*Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 163 [217 Cal.Rptr. 893].)

In reaching its conclusion that administrative remedies were not exhausted on the Society's four other arguments relating to offsite mitigation, the trial court offered this explanation:

"[The Society]'s comments [did not] alert [the City] to the contention that its handling of proposed off-site mitigation made the EIR deficient in its description of the project, in its description of the environmental background of the project, or in the sense that the project was being improperly 'piecemealed'. These claimed deficiencies are more than merely alternative legal theories arising from the allegation that off-site mitigation was being deferred improperly or would not actually reduce the impact of the project on vernal pools to 'less than significant'; they are also separate factual issues that, if accepted and acted upon, would have required restructuring and rewriting sections of the EIR entirely distinct from those addressing the mitigation measures at issue here. Nothing in [the Society]'s comments made that clear in a way that would have given [the City] the opportunity to address the issue prior to approval of the project.

"Finally, nothing in [the Society]'s comments alerted [the City] to the contention that it was required to recirculate the Draft EIR because significant new information regarding the environmental impacts of the proposed off-site mitigation measures, and a corresponding new mitigation measure to address them, allegedly had been added after circulation of the Draft EIR. Of course, [the Society's comment] letter could not have addressed these issues, because the new environmental impact and the new mitigation measures . . . related to off-site mitigation were announced in the responses to [the Society]'s comment. . . . But [the Society] still could have addressed the issue prior to [the City]'s final decision to certify the Final EIR and approve the project. No evidence is cited that it did so."

The trial court's analysis of the exhaustion issue is well reasoned and persuasive, and nothing in the Society's argument on appeal convinces us the trial court erred. The core of the Society's comments on the draft EIR was that the mitigation measures proposed in the EIR to reduce the impact of the Project on the vernal pool and seasonal wetland habitats were inadequate because the EIR did not "identify the proposed mitigation site and discuss the environmental impacts associated with the proposed mitigation and monitoring plan" and "committing to the preparation of a document does not constitute mitigation." Nothing in these comments called into question the description of the Project or its environmental background or suggested the Project was being improperly "piecemealed." Also, the Society still has not cited any evidence that it ever attempted to raise in the administrative proceedings the issue of recirculation of the EIR.

On appeal, the Society attempts to draw support for its challenge to the trial court's conclusions on the exhaustion issue from two cases, but neither case is helpful to the Society. In *Save Our Residential Environment v. City of West Hollywood* (1992) 9 Cal.App.4th 1745 [12 Cal.Rptr.2d 308] (*SORE*), a nonprofit association of property owners and residents (SORE) challenged the adequacy of an EIR relating to a five-story residential care facility for senior citizens to be built in the City of West Hollywood. (*Id.* at p. 1748.) The ultimate issue was "whether the EIR for the Project was required to examine alternative sites outside the territorial limits of the City, since the EIR found no feasible alternative sites within the City." (*Ibid.*) The City contended SORE had not exhausted its administrative remedies on that issue because "SORE did not specifically object to the legal adequacy of the EIR's alternative site analysis . . . ." (*Id.* at p. 1750.) The appellate court rejected that argument, concluding "that SORE's objections to the Project, while not identifying the precise legal inadequacy upon which the trial court's ruling

ultimately rested, fairly apprised the City and Rossmoor [the developer] that SORE believed the environmental impacts of developing the Project on the Rossmoor site would be deleterious to the surrounding community." (*Ibid.*)

Given that the appellate court in *SORE* failed to identify what SORE's actual "objections to the Project" were, the *SORE* case is of little assistance here, as we cannot determine exactly what comments the court found were sufficient to exhaust administrative remedies on the adequacy of the EIR's alternative site analysis and thus cannot extrapolate from the facts of that case a legal principle we can apply to the facts of this case. Without that detail, *SORE* at best stands for the proposition that complaints a project will be deleterious to the surrounding community may be sufficient to exhaust administrative remedies on the EIR's failure to adequately examine alternative sites. But the Society fails to explain how that proposition has any bearing here. The Society's comments that the EIR here did not "identify the proposed mitigation site and discuss the environmental impacts associated with the proposed mitigation and monitoring plan" and that "committing to the preparation of a document does not constitute mitigation" did not fairly apprise the City that the draft EIR was inadequate in its description of the Project and its environmental background, that environmental review of the Project was being improperly "piecemealed," or that the EIR would need to be recirculated.

In the second case the Society cites—*East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist.* (1989) 210 Cal.App.3d 155 [258 Cal.Rptr. 147]—a school district, in determining that its decision to close a high school and transfer the students to other schools was exempt from CEQA, failed to consider "all physical changes caused by the transfer, including the cumulative impacts of the transfer and related past and reasonably foreseeable future closings and transfers" and instead considered "only . . . specified physical changes at the receptor schools." (*East Peninsula*, at pp. 159, 162, 165.) On appeal, the district asserted that the plaintiff had failed to exhaust administrative remedies on the issue of cumulative impacts, but the appellate court disagreed, concluding various comments were sufficient to alert the school district "to the fact that its method of analysis was faulty and should be expanded to include analysis of long-term impacts, traffic and safety." (*Id.* at p. 176.) The specific comments mentioned in the appellate opinion are set forth in the following footnote.[9]

---

[9] One person wrote in a letter, " 'Have you prepared an Environmental Impact Report? Due to the increased traffic and smog, etc., isn't this legally required?' " Another person stated at a hearing, " 'I think what you need to do is look at a long term solid based analysis that projects the impacts in the long term.' " At the same meeting, another person complained that " 'nowhere have you mentioned in your criteria the most basic concern of many Peninsula

Like the *SORE* case, *East Peninsula* is of little assistance to the Society here. While the comments in *East Peninsula* fairly apprised the school district of the need to address cumulative impacts of the school closure and transfer, including impacts to traffic and safety, the comments of the Society here did not fairly apprise the City that the draft EIR was inadequate in its description of the Project and its environmental background, that environmental review of the Project was being improperly "piecemealed," or that the EIR would need to be recirculated.

For the foregoing reasons, we agree with the trial court that the Society did not exhaust its administrative remedies on the four other arguments relating to offsite mitigation. Accordingly, we turn to our analysis of the two arguments the trial court concluded were raised in the administrative proceeding.

### 2. *Improper Deferral of Mitigation*

As we have noted, the Society argued in the trial court that by failing to describe where the offsite mitigation might occur and failing to analyze or disclose the impacts of that mitigation, the City had "unlawfully deferred development and adoption of mitigation measures until after project approval." In support of this argument, the Society relied on *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1394–1395 [43 Cal.Rptr.2d 170], which in turn discussed two earlier cases involving claims of improperly deferred mitigation: *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296 [248 Cal.Rptr. 352] and *Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011 [280 Cal.Rptr. 478] (*SOCA*). We begin our discussion of this issue with an analysis of this trio of cases.

*Sundstrom* involved the granting of a use permit for a private sewage treatment plant based on a negative declaration. (*Sundstrom v. County of Mendocino, supra,* 202 Cal.App.3d at pp. 301–303.) The use permit included conditions requiring the applicant to obtain hydrological studies analyzing the effect of the project on " 'adjacent sewage disposal systems and surface and ground water hydrology,' " as well as " 'soil stability, erosion, sediment transport, and the flooding of downslope properties' " and (implicitly) requiring the applicant to mitigate any such effects the studies identified. (*Id.* at p. 306.)

On appeal from the denial of a petition for a writ of mandate requiring the preparation of an EIR, Division One of the First Appellate District concluded, "The requirement that the applicant adopt mitigation measures recommended in a future study is in direct conflict with the

parents and that is traffic and safety.' " (*East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist., supra,* 210 Cal.App.3d at p. 176.)

guidelines implementing CEQA. . . . [¶] By deferring environmental assessment to a future date, the conditions run counter to that policy of CEQA which requires environmental review at the earliest feasible stage in the planning process. . . . [¶] It is also clear that the conditions improperly delegate the County's legal responsibility to assess environmental impact by directing the applicant himself to conduct the hydrological studies subject to the approval of the planning commission staff." (*Sundstrom v. County of Mendocino, supra,* 202 Cal.App.3d at pp. 303, 306–307.)

*SOCA* involved a challenge to the adequacy of an EIR addressing the mitigation of traffic and parking impacts of the expansion of the downtown Sacramento Convention Center complex and the construction of a nearby office tower. (*SOCA, supra,* 229 Cal.App.3d at p. 1015.) The EIR determined that, "under the worst case scenario, . . . parking spaces would . . . be needed for 2,621 cars." (*Id.* at p. 1020.) The plaintiffs complained the EIR was "defective because the City failed to describe and examine 'true' mitigation measures and failed to analyze the potential environmental impacts of implementing such measures." (*Id.* at p. 1026.) More specifically, the plaintiffs complained the EIR contained "no specific mitigation measures for the parking impacts, but instead offer[ed] a list of 'seven general measures of the sort that might be included in [the City's] unformulated "Transportation Management Plan." ' " (*Ibid.,* italics omitted.) In support of their argument, the plaintiffs relied on *Sundstrom.* (*SOCA,* at p. 1027.)

On appeal from the denial of a petition for a writ of mandate, this court found *Sundstrom* distinguishable and concluded the "proposed mitigation measures satisfied CEQA." (*SOCA, supra,* 229 Cal.App.3d at p. 1030.) The court explained that "in *Sundstrom* the county had determined, before the required studies were even performed, that the project would not have a significant impact on the environment. In contrast, the City in the present case acknowledged traffic and parking have the potential, particularly under the worst case scenario, of causing serious environmental problems. The City did not minimize or ignore the impacts in reliance on some future parking study. [¶] Moreover, the county in *Sundstrom* approved the project without considering or addressing any mitigation measures. In the present case, the City has set forth a list of alternatives to be considered in the formulation of a transportation management plan, a plan the City itself, not the developer, will prepare. [¶] . . . [¶] . . . The range of alternatives includes scheduling changes for the expanded center's activities, satellite parking locations; public transit, carpooling; and construction of new parking or expanded use of existing parking." (*SOCA,* at pp. 1028–1030, italics omitted.) Moreover, the City had "committed itself to mitigating the impacts of parking and traffic" and had "approved funds for a major study of downtown transportation." (*Id.* at p. 1029.)

*Gentry* involved the approval of a residential development based on a mitigated negative declaration. (*Gentry v. City of Murrieta, supra,* 36 Cal.App.4th at p. 1367.) Among other things, the plaintiff complained, "some conditions [placed on the project] improperly deferred the determination of appropriate mitigation into the future." (*Id.* at p. 1393.) On appeal from the denial of a petition for a writ of mandate, Division Two of the Fourth Appellate District concluded most of the challenged conditions did *not* improperly defer mitigation. (*Id.* at pp. 1359, 1394–1396.) The only condition the court found "improperly defer[red] the formulation of mitigation" was a condition that allowed the developer "to obtain a biological report regarding the Stephens' kangaroo rat" and "comply with any recommendations in the report." (*Id.* at p. 1396.) The *Gentry* court concluded this condition was "on all fours with the condition in *Sundstrom* which required the applicant to comply with any recommendations of a report that had yet to be performed." (*Gentry,* at p. 1396.)

The principles of deferred mitigation expressed in *Sundstrom, SOCA,* and *Gentry* are succinctly summarized in the California Code of Regulations, title 14, section 15126.4, subd. (a)(1)(B),[10] which provides that "[f]ormulation of mitigation measures should not be deferred until some future time. However, measures may specify performance standards which would mitigate the significant effect of the project and which may be accomplished in more than one specified way."

Unlike the trial court, we do not agree with the Society that the City violated the principles expressed in *Sundstrom, SOCA,* and *Gentry* regarding improper deferral of mitigation. *Sundstrom* and *Gentry* stand for the proposition that it is improper to defer the formulation of mitigation measures until after project approval; instead, the determination of whether a project will have significant environmental impacts, and the formulation of measures to mitigate those impacts, must occur *before* the project is approved. On the other hand, *SOCA* stands for the proposition that when a public agency has evaluated the potentially significant impacts of a project and has identified measures that will mitigate those impacts, the agency does not have to commit to any particular mitigation measure in the EIR, as long as it commits to mitigating the significant impacts of the project. Moreover, under *SOCA,* the details of exactly how mitigation will be achieved under the identified measures can be deferred pending completion of a future study.

---

[10] Hereafter, we will refer to the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.) in the format CEQA Guidelines, section ____.

The City satisfied these requirements here. The City did not defer a determination of whether the Project would have a significant impact on the vernal pool and seasonal wetland habitats or defer the identification of measures calculated to mitigate that impact. Rather, the City determined the impact the Project would have—habitat loss—and identified a specific measure to mitigate that impact—preservation or creation of replacement habitat offsite in a specific ratio to the habitat lost as a result of the Project. While it is true the City did not identify any specific proposed mitigation site, there is nothing in *Sundstrom, SOCA,* or *Gentry* that required it to do so. Just as the City of Sacramento in *SOCA* did not have to choose in the EIR exactly which of the mitigation measures it had identified would ultimately be used to mitigate the impact of the convention center project on downtown parking, the City here did not have to identify exactly where in the Laguna Formation Area any offsite mitigation site would be located. In both instances, the agency was entitled to rely on the results of a future study to fix the exact details of the implementation of the mitigation measures the agency identified in the EIR.

In accepting the Society's argument that the City improperly deferred mitigation relating to the loss of vernal pool and seasonal wetland habitat, the trial court expressed its belief that "in order to be valid, a proposed mitigation measure that is intended to be carried out at some time after project approval must be sufficiently detailed that the public and the approving agency may make an informed decision about whether it will actually work as advertised, and that it must be realistically foreseeable that the measure will actually be carried out as outlined. If the success of a proposed mitigation measure is uncertain, the approving agency cannot reasonably determine that significant effects will be mitigated below the level of significance. [Citation.] And if there is no information at hand demonstrating that a proposed mitigation solution can or will be carried out, the approving agency does not have meaningful information reasonably justifying an expectation of compliance with the condition."

■ We agree with the City that, in part, these comments evidence a confusion of two distinct CEQA concepts: (1) whether the agency has improperly deferred the formulation of mitigation measures; and (2) whether the mitigation measures the agency has formulated are *feasible*. A mitigation measure is feasible if it is "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (CEQA, § 21061.1.) Under this definition, concerns about whether a specific mitigation measure "will actually work as advertised," whether it "can . . . be carried out," and whether its "success . . . is uncertain" go to the *feasibility* of the mitigation measure,

not to whether its formulation has been improperly deferred. Similarly, concerns about whether it is "realistically foreseeable that [a mitigation] measure will actually be carried out as outlined" do not raise an issue of improper deferral. If the agency has identified one or more mitigation measures and has committed to mitigating the impact those measures address, then the principles forbidding deferral of mitigation are not implicated.

In its challenge to the EIR in the trial court (as well as in its comments on the EIR), the Society did not argue that the offsite mitigation measures the City proposed were not feasible or that the City had not fully committed to implementing those measures. Instead, as the trial court described it, the issue the Society raised was "whether mitigation of impacts on vernal pools, wetlands, and associated animal species, improperly [were] deferred." Under the case law on which the Society relied, the answer to that question is "no."

The Society argues that regardless of *Sundstrom, SOCA*, and *Gentry*, the City improperly deferred mitigation of the loss of vernal pool and seasonal wetland habitat in violation of principles the California Supreme Court recently set out in *Vineyard*. We are not persuaded.

*Vineyard* involved the EIR relating to the Sunrise Douglas Community Plan, which contemplates the development of a master planned community (of which the Project here is a part) with "more than 22,000 residential units, housing as many as 60,000 people, together with schools and parks, as well as office and commercial uses occupying about 480 acres of land." (*Vineyard, supra,* 40 Cal.4th at pp. 421–422.) The primary issue the Supreme Court addressed on review was the adequacy of the EIR's water supply analysis. (*Id.* at pp. 427–447.) The plaintiffs in *Vineyard* complained the EIR was "deficient in that it 'fail[ed] to identify the actual source of most of the water needed to fill the project's long-term demand,' an analytical gap that 'serve[d] to obscure the undisclosed environmental impacts of the project.' " (*Id.* at p. 427.) As the Supreme Court put it, "The principal disputed issue [wa]s how firmly future water supplies for a proposed project must be identified or, to put the question in reverse, what level of uncertainty regarding the availability of water supplies can be tolerated in an EIR for a land use plan." (*Id.* at p. 428.)

In addressing this issue, the Supreme Court discussed "several [Court of Appeal] decisions [that] specifically addressed the sufficiency of an EIR's analysis of future water supplies" and from which the Supreme Court distilled "certain principles for analytical adequacy under CEQA" of an

"analysis of future water supplies." (*Vineyard, supra*, 40 Cal.4th at pp. 428–430.) One of the cases the Supreme Court discussed was *Stanislaus Natural Heritage Project v. County of Stanislaus* (1996) 48 Cal.App.4th 182 [55 Cal.Rptr.2d 625]. As relevant here, the Supreme Court offered this summary of the *Stanislaus* decision: "Before approving a specific plan for an entire development, the decision makers must be informed of the intended source or sources of water for the project, 'what the impact will be if supplied from a particular source or possible sources and if that impact is adverse how it will be addressed.' [Citation.] CEQA, the court recognized, permits the environmental analysis for long-term, multipart projects to be 'tiered,' so that the broad overall impacts analyzed in an EIR at the first-tier programmatic level need not be reassessed as each of the project's subsequent, narrower phases is approved, but tiering 'is not a device for deferring the identification of significant environmental impacts that the adoption of a specific plan can be expected to cause.' [Citation.] Nor can the unanalyzed impacts of un-known water sources be mitigated by providing that if water proves unavail-able, the project's future phases will not be built: 'While it might be argued that not building a portion of the project is the ultimate mitigation, it must be borne in mind that the EIR must address the project and assumes the project will be built.' " (*Vineyard*, at p. 429, fn. omitted, quoting *Stanislaus Natural Heritage Project v. County of Stanislaus, supra*, 48 Cal.App.4th at pp. 199, 206.)

Without further discussing the *Vineyard* decision, the Society sets out the Supreme Court's summary of the *Stanislaus* decision and relies on that summary to argue that "[t]he Supreme Court ruled in *Vineyard* that a failure to identify and disclose with specificity 1) likely sources of off-site environ-mental resources that may be required to fully implement a proposed project, and 2) how the use of those resources in furtherance of the Project may, in turn, result in significant, adverse environmental effects, constitutes a viola-tion of CEQA's mandatory procedures."

This argument is deficient for several reasons. First, the portion of the *Vineyard* case the Society quotes does not contain any *holding* or *ruling* by the Supreme Court; rather, it contains the Supreme Court's summary of an earlier Court of Appeal decision. Furthermore, the Society makes no attempt to show that the Supreme Court's ruling in *Vineyard* was consistent with its summary of the *Stanislaus* decision. Second, even if we assume such consistency, the Society makes no attempt to show or explain why the reasoning in *Vineyard* and *Stanislaus*—both of which dealt specifically with the sufficiency of an EIR's analysis of future water supplies—can or should

be extended to the sufficiency of an EIR's formulation of mitigation measures involving offsite habitat replacement. Because the Society's abbreviated discussion of *Vineyard* does not include any attempt to identify the underlying principles that drove either the *Vineyard* decision or the *Stanislaus* decision, we cannot discern whether those principles compel an extension of the holding of those cases from the water supply context to the offsite mitigation context.

In summary, the Society has failed to persuade us that the *Vineyard* decision on the adequacy of an EIR's analysis of future water supplies supplants or in any way alters the principles of deferred mitigation set forth in *Sundstrom*, *SOCA*, and *Gentry*. And because we have concluded already that the EIR here did not violate those principles, we likewise conclude the trial court erred when it determined otherwise.

The question remains, however, whether the trial court's ultimate ruling regarding the EIR as it relates to the issue of offsite mitigation can nonetheless be sustained on the alternate ground the trial court decided the Society had properly raised in the administrative proceedings, namely, "whether the finding that proposed off-site mitigation measures would reduce the impacts on vernal pools to a 'less than significant level' was supported by substantial evidence." We turn our attention to that issue.

### 3.  *Sufficiency of the Evidence*

█  Under CEQA, "If the agency decides to approve a project despite its significant adverse impacts, the agency must issue findings which specifically state how the agency has responded to the significant impacts identified in the EIR." (*SOCA, supra*, 229 Cal.App.3d at p. 1034; see CEQA, § 21081; CEQA Guidelines, § 15091.) One such finding is that "[c]hanges or alterations have been required in, or incorporated into, the project which mitigate or avoid the significant effects on the environment." (CEQA, § 21081, subd. (a)(1); see CEQA Guidelines, § 15091, subd. (a)(1).) Any such finding must be supported by substantial evidence in the record. (CEQA Guidelines, § 15091, subd. (b).)

Here, the Society argued in the trial court that "the evidence in the certified record of proceedings does not support the City's findings that the project's potentially significant, adverse environmental effects will be reduced to 'less than significant' levels." More specifically, the Society argued the City's finding of mitigation was not supported by the evidence in the record because "[t]he state and federal agencies with the requisite expertise, and jurisdiction

by law, over these resources (USFWS, USACE, USEPA and CDFG)[11] reviewed and commented (several times) on the mitigation measures proposed in the EIR and adopted in the City's findings" and "unanimously informed the City that, in their professional judgment, and based on their expertise and the facts before them, adoption of the EIR's proposed mitigation measures, would 'result in significant impacts to, and loss of' listed species and the habitats upon which they depend." The Society repeats these arguments nearly verbatim in its brief on appeal.

Pointing out that other agencies disagreed with the City's finding that its chosen mitigation measures would reduce the adverse impacts of the Project on the vernal pool and seasonal wetland habitats to less than significant does not show there was insufficient evidence in the record to support the City's finding. As we have noted, the burden is on the party challenging the EIR to show it is inadequate. (*Barthelemy v. Chino Basin Mun. Water Dist., supra*, 38 Cal.App.4th at p. 1617.) Given that "[s]ubstantial evidence challenges [under CEQA] are resolved much as substantial evidence claims in any other setting . . ." (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 945 [91 Cal.Rptr.2d 66]), the burden was on the Society to *affirmatively show* there was no substantial evidence in the record to support the City's findings, and the Society could not carry that burden by simply pointing to portions of the administrative record that favored its position. (See, e.g., *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573–1574 [43 Cal.Rptr.3d 741] [apply rules of substantial evidence review in criminal case].) Rather, the Society needed to set forth in its challenge to the EIR all of the evidence material to the City's finding, then show that that evidence could not reasonably support the finding. (See *id.* at p. 1574.) The Society did not do this.

As the City points out, "The main premise of [the Society's] argument is . . . that the federal agencies disagree with the City's evidence and conclusions and have a different vision for the area. . . . [T]his disagreement does not constitute a basis for overturning the City's decision." We would add only this: Pointing to evidence of a disagreement with other agencies is not enough to carry the burden of showing a lack of substantial evidence to support the City's finding. Thus, the Society's challenge to the sufficiency of the evidence fails.

---

[11] USFWS is the Service, USACE is the Corps, and CDFG is the California Department of Fish and Game.

## C

*Incorporation of the Sunrise Douglas Community Plan EIR*

The EIR here noted that "the City, through incorporation by reference, is using the Master EIR [i.e., the EIR for the Sunrise Douglas Community Plan] in a manner similar to what would be accomplished through tiering: relying largely on existing information about broad, area wide or regional issues and impacts, while updating that information where necessary and focusing on site specific issues not addressed previously."

When this action was commenced in the trial court in September 2006, the *Vineyard* case, which involved challenges to the Sunrise Douglas Community Plan EIR, was pending in the California Supreme Court. Anticipating that the Supreme Court's ruling in *Vineyard* might have a bearing on the validity of the EIR here, the Society asserted generally in its statement of issues (CEQA, § 21167.8, subd. (f)) in January 2007 that the City's approval of the Project "must be set aside because the [EIR] incorporates and relies upon analysis and conclusions in the overlying Sunrise Douglas Community Plan EIR that may be invalidated by the Supreme Court."

After the *Vineyard* decision came out in February 2007, the Society included more specific arguments in its opening brief (filed in March 2007) based on that decision. Specifically, the Society argued the Project EIR had incorporated the "discussion and analysis" in "two key portions of the [Sunrise Douglas Community Plan] EIR": specifically, "long-term water supply impacts" and "impacts to the Cosumnes River." The Society contended that because the Supreme Court had invalidated the Sunrise Douglas Community Plan EIR for failure to adequately consider these impacts, the Project EIR had to be invalidated on this basis as well.

In its opposition, the City argued that administrative remedies had not been exhausted on this issue because "the record does not disclose so much as a statement of concern over the EIR's water supply analysis or over potential impacts on the Cosumnes River *by anyone* during the administrative proceedings," let alone any "claim that the EIR was defective because it improperly incorporated or relied too extensively upon the [Sunrise Douglas Community Plan] EIR."

The trial court first observed that "[t]he essence of the exhaustion doctrine is notice" and thus "[t]he key issue here . . . is whether [the City] had notice that the [Project] EIR . . . was questionable insofar as it relied upon portions of the EIR for the [Sunrise Douglas Community Plan] that were in litigation and might eventually be ruled invalid." The court relied on the fact that when

the City certified the Project EIR and approved the Project, the action involving the validity of the Sunrise Douglas Community Plan EIR was already pending before the California Supreme Court and the City was a party to that action. In the trial court's view, by virtue of these facts the City "had actual notice that, to the extent that the [Project] EIR expressly relied upon portions of the earlier EIR that were the subject of litigation, such reliance was questionable" and the City "had the opportunity to avoid any problems arising out of such reliance before approving the [Project] and its EIR." Thus, the court found, "the purpose of the exhaustion doctrine has been served in this case."

On the merits, the trial court determined the EIR was not invalid based on its discussion of long-term water supply impacts of the Project because "the discussion of cumulative water supply impacts in the project EIR does not appear to be based on the discussion of that issue in the [Sunrise Douglas Community Plan] EIR" and because the "contribution [of the Project] to the impacts of long-term water supplies might even be described as essentially non-existent."

The trial court reached a different conclusion, however, with respect to impacts on the Cosumnes River. The court noted that the Supreme Court had invalidated the Sunrise Douglas Community Plan EIR in part because the final EIR had disclosed for the first time a potentially substantial new impact on salmon in the Cosumnes River. (*Vineyard, supra*, 40 Cal.4th at p. 449.) The Supreme Court concluded in *Vineyard* that the Sunrise Douglas Community Plan EIR had to be recirculated for public comment on this issue. (*Ibid.*) The trial court here noted that the Project EIR did "not include the disclosure of the potential impact on the Cosumnes River that appeared in the [Sunrise Douglas Community Plan] EIR" and thus "suffers from the same defect that was found in the *Vineyard* . . . case, that of failing to disclose this impact to the public for comment." Thus, the court directed the issuance of a writ of mandate "to require the Draft EIR to be revised and recirculated with regard to this issue."

On appeal, the City and Jaeger contend the trial court erred in determining that the Society was not required to exhaust administrative remedies on its arguments related to the Project EIR's reliance on the Sunrise Douglas Community Plan EIR. In the alternative, they contend the court erred in invalidating the Project EIR based on its failure to disclose the potential impact of the Project on the salmon in the Cosumnes River because, based in part on information that was not available when the Sunrise Douglas Community Plan EIR was prepared, there was substantial evidence in the record that the Project would not have any such impact.

For its part, in its cross-appeal, the Society contends the trial court erred in determining the EIR was not invalid based on its discussion of long-term water supply impacts of the Project.

Once again, we begin our discussion with the exhaustion issue. As will be seen, since the exhaustion issue is dispositive of these challenges to the EIR, we need not reach either side's arguments on the merits of the challenges related to the Project EIR's reliance on the Sunrise Douglas Community Plan EIR.

■ We have explained the fundamental principles of the exhaustion doctrine already. What is most important in applying that doctrine here is the language of subdivision (a) of CEQA section 21177, which expressly provides that "[n]o action or proceeding may be brought pursuant to Section 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person during the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination." By its plain language, this statute requires that the alleged grounds for noncompliance with CEQA a party seeks to raise in a CEQA action must have been presented to the public agency by someone during the administrative proceeding.

The purpose of the exhaustion doctrine is to ensure the administrative agency "will have had an opportunity to act and render the litigation unnecessary." (*Resource Defense Fund v. Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 894 [236 Cal.Rptr. 794].) That is why CEQA section 21177 requires someone to have presented to the administrative agency in the administrative proceeding the alleged ground for noncompliance with CEQA that a litigant later seeks to raise in a CEQA action—so the agency knows about the claimed problem and has an opportunity to fix it before legal action is commenced. To satisfy the exhaustion requirement, objections a party seeks to raise in a CEQA action must have been made "known in *some* fashion, however unsophisticated[, in the administrative proceeding]. Otherwise, the [agency] would have no opportunity to respond to those objections prior to judicial review—which is the 'essence of the exhaustion doctrine.' " (*Park Area Neighbors v. Town of Fairfax* (1994) 29 Cal.App.4th 1442, 1449 [35 Cal.Rptr.2d 334].)

Here, in the trial court the Society challenged the Project EIR's reliance on and incorporation of the Sunrise Douglas Community Plan EIR's discussion and analysis of "long-term water supply impacts" and "impacts to the Cosumnes River," which the Supreme Court found were inadequate in *Vineyard.* To satisfy the exhaustion doctrine, someone had to have raised

these challenges—or something like them at least—in front of the City during the administrative proceeding. That did not happen.

■ To the extent the Society relies on the Project EIR's incorporation by reference of the Sunrise Douglas Community Plan EIR and the fact that the administrative record includes a copy of the latter EIR to satisfy the exhaustion doctrine, that reliance is misplaced. The Society offers no authority for its argument that, by incorporating the analyses of "long-term water supply" and "impacts to biological resources in the Cosumnes River" from the Sunrise Douglas Community Plan EIR into the Project EIR, "The City, by definition, incorporated the objections that were raised to the adequacy of" these analyses in comments on the Sunrise Douglas Community Plan EIR. The suggestion that an agency must treat as a comment on a current EIR any comment received on an earlier EIR that the current EIR relies on or incorporates by reference has no support in the law, as far as we can determine, presumably because an agency is entitled to know exactly what objections members of the public have to the current EIR. If one of those objections is that the current EIR incorporates a faulty or insufficient analysis from an earlier EIR, then the agency is entitled to notice of this objection, so that it can correct the deficiency or explain why it believes there is no deficiency. An objector cannot simply sit back and wait for the earlier EIR to be invalidated, then belatedly assert after the administrative proceeding is complete (as happened here) that the current EIR is defective because it relied on the earlier EIR that has now been invalidated.

Nor is it sufficient, as the Society suggests, that the agency had "notice" of the alleged deficiencies in the earlier EIR at the time it relied on that EIR in preparing the current EIR. If the Legislature had wanted mere "notice" to be the applicable standard, it could have written CEQA section 21177 to provide for that. Instead, the Legislature incorporated into that section a traditional exhaustion requirement, which demands that any deficiency a litigant seeks to raise in a CEQA action must have been raised before the agency in the administrative proceeding.

Here, the Society points to only one purported "comment" on the Project presented to the City during the administrative proceeding to satisfy the exhaustion doctrine. As we will explain, the Society has failed to show that that "comment" raised the issues the Society sought to raise in the trial court and therefore the Society has failed to show the exhaustion doctrine was satisfied by this "comment."

According to the Society, USEPA, "in commenting on the Project, . . . objected to the Project's reliance on 'conjunctive use' and the City's proposal to use groundwater from the North Vineyard well field to meet long-term

water supply." The "comment" the Society refers to is a paragraph entitled "Groundwater Supply" that appears in a document entitled "Detailed USEPA Concerns" that was an attachment to a letter dated December 7, 2001, from USEPA to a district engineer for the Corps relating to another project in the Sunrise Douglas Community Plan area. This earlier letter was submitted to the City in connection with this Project in October 2004 when USEPA attached the letter to its response to the notice of preparation for the Project EIR.

In the "Groundwater Supply" paragraph, the "Detailed USEPA Concerns" document drew information from the Sunrise Douglas Community Plan EIR about the water supply for the Sunrise Douglas Community Plan area. The document noted that "[t]he FEIR's water supply plan proposes sole reliance on groundwater to meet the demands generated in the short-term by anticipated build-out within the Specific Plan area,[12] with reliance on 'conjunctive use' to meet demands that grow over the long-term. Initially, it appears that groundwater will be drawn from a well field in the North Vineyard area, and the proposed project would draw groundwater from the Elk Grove area aquifer—an aquifer where overdraft already appears to be a serious problem. We expect that further draw-down of this aquifer will have severe, adverse impacts on the aquatic resources of the Cosumnes River watershed and, therefore, the Bay/Delta ecosystem."

Unfortunately, the Society's argument based on this paragraph is abbreviated—amounting to little more than a reference to where the material appears in the administrative record, accompanied by a mischaracterization of the material as an "object[ion to] . . . the City's proposal to use groundwater from the North Vineyard well field to meet long-term water supply." Because it does not develop its argument, the Society fails to explain how USEPA's supplying this earlier document to the City in response to the notice of preparation of the Project EIR satisfied the exhaustion doctrine with respect to the arguments the Society ultimately sought to pursue here, specifically, arguments regarding the propriety of the Project EIR's reliance on the faulty discussion and analysis of "long-term water supply impacts" and "impacts to the Cosumnes River" in the Sunrise Douglas Community Plan EIR. For our part, we note that nothing in this material even purported to criticize the contents of the Sunrise Douglas Community Plan EIR, let alone the incorporation of that EIR into the Project EIR. Thus, we are at a loss to understand how it could have satisfied the exhaustion requirement with respect to the Society's arguments.

---

[12] The "Specific Plan" refers to "the SunRidge Specific Plan," which "detail[ed] the proposed development of a substantial portion of the [Sunrise Douglas] project—2,600 acres" of the "more than 6,000 . . . acres" encompassed in the Sunrise Douglas project as a whole. (*Vineyard, supra*, 40 Cal.4th at pp. 421–422.) The Sunrise Douglas Community Plan area EIR addressed the likely environmental consequences of *both* plans. (*Id.* at p. 422.)

The Society relies on *Friends of the Santa Clara River v. Castaic Lake Water Agency* (2002) 95 Cal.App.4th 1373 [116 Cal.Rptr.2d 54] to support its contention that the Project EIR has to be invalidated because of its incorporation by reference of material in the Sunrise Douglas Community Plan EIR that the Supreme Court found inadequate in *Vineyard*. That reliance is misplaced.

In *Friends*, Division Four of the Second Appellate District concluded a tiered EIR was invalid because the prior EIR from which it was tiered had been decertified as the result of an opinion by this court (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892 [100 Cal.Rptr.2d 173]) finding the prior EIR inadequate and because CEQA "authorizes tiering [only] where the previous EIR was certified." (*Friends of the Santa Clara River v. Castaic Lake Water Agency, supra*, 95 Cal.App.4th at pp. 1375–1376, 1384, 1387; see CEQA, § 21094, subd. (a).) What is significant about *Friends* here is that the case from this court decertifying the prior EIR was not decided until the challenge to the EIR in the *Friends* case was on appeal. (*Friends of the Santa Clara River*, at p. 1375.)

■ To the extent the Society, by relying on *Friends*, means to imply that the exhaustion requirement did not have to be met here because, as in *Friends*, the grounds for invalidating the EIR arose from another case that was not decided until after the administrative proceedings were complete, we reject that argument. First, *Friends* did not address the exhaustion doctrine, and "cases, of course, are not authority for propositions not there considered." (*People v. Ceballos* (1974) 12 Cal.3d 470, 481 [116 Cal.Rptr. 233, 526 P.2d 241].) Second, had the exhaustion issue been raised in *Friends*, it would have been true that the defect there—decertification of the prior EIR—could not have been raised in the administrative proceeding because the prior EIR was not decertified until even after the trial court proceedings concerning the tiered EIR had concluded and the matter was on appeal. Whether recognition of an impossibility exception to the exhaustion requirement might have been justified under those circumstances is a question we need not answer here because the circumstances in this case are markedly different. The Society does not seek to invalidate the Project EIR simply because the Sunrise Douglas Community Plan EIR was invalidated; rather, the Society seeks to invalidate the Project EIR because it allegedly incorporated faulty analysis and discussion from the earlier EIR. But nothing prevented the Society from presenting this argument to the City during the administrative proceedings on the Project EIR. It is true the Society would not have had the benefit of the *Vineyard* decision in arguing the analysis and discussion in the earlier EIR was faulty, but the Society could have made that argument nevertheless based

on the very same reasoning and authorities used by the parties who eventually prevailed in *Vineyard*. Thus, even assuming recognition of an impossibility exception to the exhaustion requirement might be appropriate in certain circumstances, no such circumstances exist here.

Under the circumstances of this case, we conclude the trial court erred in determining the exhaustion doctrine was satisfied with respect to the Society's complaints about the Project EIR's reliance on the Sunrise Douglas Community Plan EIR. Because this issue was not exhausted at the administrative level, the trial court had no authority to consider it and thus erred in invalidating the Project EIR based on its alleged failure to disclose the potential impact of the Project on the salmon in the Cosumnes River.[13]

D

*Compliance with and Amendment of Mitigation Measures from the Sunrise Douglas Community Plan EIR*

The Sunrise Douglas Community Plan included a mitigation measure (BR-2) that required any future project proponent to "submit a wetland delineation for the proposed development area, and a detailed plan which describes the specific methods to be implemented to avoid and/or mitigate any project impacts upon wetlands" "[i]n conjunction with the filing and processing of applications for future development entitlements (such as tentative subdivision maps or development plans)." The Sunrise Douglas Community Plan also contained another mitigation measure (BR-4) that required project applicants to obtain various necessary permits from other agencies "[p]rior to approval of any future development projects (such as tentative subdivision maps, development plans, improvements plans)."

The Project applicants here proposed to change those mitigation measures to allow the required actions to be delayed so that they would have to be taken only "[p]rior to approval of any improvement plans or grading permits." The City approved the change and amended the Sunrise Douglas Community Plan accordingly along with its approval of the Project.

In the trial court, the Society argued the City violated CEQA by approving the Project without requiring compliance with mitigation measures BR-2 and

---

[13] The Society has requested that we take judicial notice of the judgment and peremptory writ of mandate issued by the trial court following the appeal in the *Vineyard* case. Because we have concluded the Society's challenge to the EIR here based on the City's reliance on the Sunrise Douglas Community Plan EIR was not preserved for review by the exhaustion of administrative remedies, what has happened to the Sunrise Douglas Community Plan EIR on remand from the Supreme Court in the *Vineyard* case is of no consequence to our decision. Accordingly, we deny the Society's request for judicial notice.

BR-4 in their unamended form. Essentially the Society's argument was that CEQA did not allow the City to amend the mitigation measures once they were final. In its opposition, the City argued (among other things) that neither the Society nor any other party had raised this issue in the administrative proceedings. The trial court agreed that administrative remedies had not been exhausted on this issue. In reaching this conclusion, the court determined the Society's comments were not sufficient to preserve the issue, and specifically noted that the Society had "not cited any evidence in the record demonstrating that any other party raise th[is] issue[] in a manner that could preserve [it] for judicial review."

In its cross-appeal, the Society asserts the trial court erred on this point. In support of its argument, the Society does not rely on any comment it made in the administrative proceeding. Instead, the Society identifies (for the first time) comments made by USEPA and the Service that it claims were sufficient to satisfy the exhaustion doctrine. As the City points out, however, the comments on which the Society relies do not mention mitigation measures BR-2 and BR-4, nor do those comments tend to suggest in any manner that the City violated CEQA by amending those mitigation measures.

The Society asserts that "[b]ased on these comments, the City was on notice that the Project did not meet the relevant agenc[ies'] permitting requirements, as mandated by . . . mitigation measures BR-2 and BR-4." But even if this is true, it does not assist the Society on the exhaustion issue. Assuming the City could determine, based on these comments, that the two federal agencies did not believe their permitting requirements would be met by the Project, such information would not have given the City notice of any alleged problem with its amendment of mitigation measures BR-2 and BR-4, let alone notice of the specific assertion the Society later sought to raise in the trial court—that the City violated CEQA by amending the mitigation measures. As we have previously observed, CEQA section 21177 requires that someone must have presented the alleged ground of noncompliance with CEQA to the agency during the administrative proceeding. That did not happen here with respect to the Society's complaints about the amendment of mitigation measures BR-2 and BR-4. Accordingly, the trial court correctly determined that administrative remedies were not exhausted on this issue.

■ In summary, we conclude the trial court erred in finding the City violated CEQA in its certification of the Project EIR and approval of the Project. The Society failed to establish any such violation on which administrative remedies were exhausted. Accordingly, the trial court should have ruled in favor of the City and Jaeger on the first four causes of action in the Society's second amended petition and erred in doing otherwise.

## II

### *The Project's Consistency with the City's General Plan*

In the trial court, the Society argued the approval of the Project had to be set aside because the Project was "inconsistent with, or will frustrate the implementation of, the City['s] . . . General Plan." In support of this argument, the Society invoked the following provisions from the natural resources element of the plan: Policy NR.1.1 provides that the City will "[p]rotect rare, threatened, and endangered species and their habitats in accordance with State and federal law." To effectuate this policy, Action NR.1.1.2 provides the City will "[r]eview projects through the entitlement process and CEQA analysis to ensure that they comply with this policy if the site contains unique habitat, creeks, and/or wooded corridors." Action NR.1.1.3 provides that "[a]s part of the consideration of development applications for individual Planning Areas containing habitats that support special-status plant and animal species that are planned to be preserved, the City shall require that these preserved habitats have interconnections with other habitat areas in order to maintain the viability of the preserved habitat to support the special-status species identified. The determination of the design and size of the 'interconnections' shall be made by the City, as recommended by a qualified professional, and will include consultation with the California Department of Fish and Game and U.S. Fish and Wildlife Service."

Policy NR.1.7 provides that "[p]rior to project approval the City shall require a biological resources evaluation for private and public development projects in areas identified to contain or possibly contain listed plant and/or wildlife species based upon the City's biological resource mapping provided in the General Plan EIR or other technical materials." To implement this policy, Action NR.1.7.1 provides that "[f]or those areas in which special-status species are found or likely to occur or where the presence of species can be reasonably inferred, the City *shall* require mitigation of impacts to those species that *ensure* that the project does not contribute to the decline of the affected species populations in the region to the extent that their decline would impact the viability of the regional population. Mitigation *shall* be designed by the City *in coordination with* the U.S. Fish and Wildlife Service (USFWS) and the California Department of Fish and Game (CDFG), and shall emphasize a multi-species approach to the maximum extent feasible. This may include development or participation in a habitat conservation plan."

Based on the foregoing provisions, the Society argued the Project was inconsistent with the City's general plan because the City did not coordinate with the Service in designing mitigation for the impacts of the Project on

special-status species. The Society noted the Service had "objected repeatedly to the biological resource mitigation measures proposed in the EIR and adopted by the City." The Society also argued the City's mitigation measures were inadequate to ensure the Project would not impact the viability of regional populations of special-status species because the Service and other agencies had "unanimously informed the City that the mitigation measures proposed in the EIR and adopted by the City *are not* adequate to support such a finding." Finally, the Society argued approval of the Project was inconsistent with the general plan provision requiring interconnection of habitat preserves determined in consultation with the Service "because the federal agencies have set forth, with specificity, the minimum habitat connectivity required *within* and *across* the [Sunrise Douglas Community Plan] area required to 'maintain the viability of the preserved habitat to support the special-status species identified' " and "because implementation of this project will *destroy* the central hub of connectivity for the wetland and vernal pool habitats in the [Sunrise Douglas Community Plan] area." In making this argument, the Society again emphasized the position taken by the Service and other agencies in opposition to the Project.

The trial court agreed with the Society, concluding that "the project is not consistent with, and does not comply with, mandatory requirements of [the City]'s General Plan regarding interconnection of preserved habitat areas that support special-status plant and animal species, and regarding mitigation of impacts on such species to ensure that the project does not contribute to the decline of the affected species population, i.e., there is no substantial evidence to support a finding that the project is consistent with, and complies with, such mandatory requirements of the General Plan."

■ "Every county and city must adopt a 'comprehensive, long-term general plan for the physical development of the county or city . . . .' (Gov. Code, § 65300.) 'The general plan has been aptly described as the "constitution for all future developments" within the city or county. . . . "[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements" [statutorily required elements include land use, circulation, housing, conservation, open space and noise].' [Citations.] 'The consistency doctrine has been described as "the linchpin of California's land use and development laws; it is the principle which infuse[s] the concept of planned growth with the force of law." . . .' " (*Families Unafraid to Uphold Rural etc. County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1336 [74 Cal.Rptr.2d 1] (*FUTURE*).)

Specifically with reference to development projects like the one here involving a subdivision, the Planning and Zoning Law provides that "[n]o

local agency shall approve a tentative map, or a parcel map for which a tentative map was not required, unless the legislative body finds that the proposed subdivision, together with the provisions for its design and improvement, is consistent with the general plan . . . ." (Gov. Code, § 66473.5.)

On appeal, the City first contends the "trial court erred by using the incorrect standard of review" in assessing the Society's argument that the Project is inconsistent with the City's general plan. According to the City, "the trial court here mistakenly applied CEQA's 'substantial evidence' test," when "[t]he proper analysis . . . 'is whether the decision is arbitrary, capricious, *entirely lacking in evidentiary support*, unlawful, or procedurally unfair.' "

The City's argument fails for two reasons. First, because we—like the trial court—review the agency's decision, not the trial court's decision, it does not matter what standard of review the trial court used because we will use the correct standard in any event. Second, there is no difference between the two standards of review, at least when it comes to determining whether the agency's finding of consistency with the general plan has the requisite evidentiary support in the record. Division Three of the Fourth Appellate District explained this very point in the decision on which the City relies—*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777 [32 Cal.Rptr.3d 177]. There, the court explained that "[w]e review decisions regarding consistency with a general plan under the arbitrary and capricious standard. These are quasi-legislative acts reviewed by ordinary mandamus, and the inquiry is whether the decision is arbitrary, capricious, entirely lacking in evidentiary support, unlawful, or procedurally unfair. [Citations.] Under this standard, we defer to an agency's factual finding of consistency unless no reasonable person could have reached the same conclusion on the evidence before it." (*Id.* at p. 782.) In a footnote, however, the court also explained as follows: "We note some cases review consistency with a general plan under the abuse of discretion standard applicable to administrative mandamus, inquiring if the agency has proceeded as required by law and the decision is supported by substantial evidence. Under the substantial evidence prong, a common formulation asks if a reasonable person could have reached the same conclusion on the evidence. [Citation.] Since this is the same test used under the arbitrary and capricious standard for factual findings, for purposes of this case we see no inconsistency." (*Id.* at p. 782, fn. 3.) We agree with this analysis. Thus, the question for us—just like it was for the trial court—is whether the City's finding of consistency with the general plan was reasonable based on the evidence in the record.

■ "A project is consistent with the general plan ' "if, considering all its aspects, it will further the objectives and policies of the general plan and not

obstruct their attainment." ' [Citation.] A given project need not be in perfect conformity with each and every general plan policy. [Citation.] To be consistent, a subdivision development must be 'compatible with' the objectives, policies, general land uses and programs specified in the general plan." (*FUTURE, supra*, 62 Cal.App.4th at p. 1336.)

In addressing the Society's claims of inconsistency between the Project and the City's general plan, it is important to keep in mind the deferential nature of our review. It is not for us to substitute our judgment for that of a local agency in making a determination of consistency; rather, the agency's determination "comes to this court with a strong presumption of regularity." (*Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal.App.4th 704, 717 [29 Cal.Rptr.2d 182].) "Once a general plan is in place, it is the province of elected city officials to examine the specifics of a proposed project to determine whether it would be 'in harmony' with the policies stated in the plan. [Citation.] It is, emphatically, *not* the role of the courts to micromanage these development decisions." (*Id.* at p. 719.) Thus, as long as the City reasonably could have made a determination of consistency, the City's decision must be upheld, regardless of whether *we* would have made that determination in the first instance.

We begin with the claimed inconsistency of the Project with Action NR.1.1.3. No one disputes the Project site "contain[s] habitats that support special-status plant and animal species that are planned to be preserved." As we have noted, the Project includes an approximately 90-acre open space/wetland preserve located in the southwest portion of the Project site that apparently encompasses 5.61 acres of habitat for the vernal pool fairy and tadpole shrimp that are to be preserved as part of the Project. The question remaining with regard to Action NR.1.1.3 is whether the City could have reasonably determined that this preserved habitat has "interconnections with other habitat areas in order to maintain the viability of the preserved habitat to support the special-status species identified" and that the City's "determination of the design and size of the 'interconnections' " "include[d] consultation with the . . . Service." The Society argued the answer to this question was "no," but we are not persuaded.

Essentially the Society's position was that the interconnection between the habitat to be preserved onsite and adjacent habitat areas was insufficient to maintain the viability of the preserved habitat to support the vernal pool fairy and tadpole shrimp because the design of the Project was inconsistent with the federal agencies' conceptual-level strategy for the Sunrise Douglas Community Plan area as a whole. In the Society's view, because the conceptual-level strategy "set forth . . . the minimum habitat connectivity" the federal agencies concluded was acceptable, the Project could not provide

the interconnectivity required by the City's general plan because of the Project's inconsistency with what the federal agencies deemed necessary.

As we have previously observed, however, in responding to the Society's substantial evidence argument under CEQA, showing evidence of a disagreement between the City and other agencies is not enough to carry the burden of showing a lack of substantial evidence to support the City's finding. Here, where the essential question is one of reasonableness, the Society—as the party challenging the City's determination—bore the burden of showing that the City's determination was unreasonable. In other words, the Society had to show why, based on all of the evidence in the record, the City could not have reasonably determined that the interconnectivity it was requiring between the habitat to be preserved onsite and adjacent habitat areas would be sufficient to maintain the viability of the preserved onsite habitat to support the vernal pool fairy and tadpole shrimp. To carry this burden, it was not enough for the Society to simply point to the fact that the Service and other agencies viewed the interconnectivity as insufficient for this purpose; the Society had to show that the City's contrary conclusion *was not reasonable* based on *all* the evidence before the City at the time of its determination. The Society did not do this. Accordingly, the Society failed to carry its burden on this point.

To the extent the Society's claim of inconsistency between the Project and Action NR.1.1.3 in the City's general plan rested on the suggestion that the City's "determination of the design and size of the 'interconnections' " did not "include consultation with the . . . Service," the claim fails on that ground as well. The question is whether the City reasonably could have decided, in approving the Project, that its determination regarding interconnectivity included the "consultation" with the Service required by the general plan. One of the meanings of the word "consult" is "to ask the advice or opinion of." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 268, col. 1.) Here, it is undisputed that the City solicited public comment on the Project and that the City received and responded to comments from the Service on the Project. Given the meaning of the word "consult" we have noted, the City reasonably could have determined that by soliciting and considering comments from the Service, it engaged in the "consultation" with the Service required by the general plan. Accordingly, the Society's claim of inconsistency between the Project and Action NR.1.1.3 in the City's general plan fails.

That brings us to the claim of inconsistency with Action NR.1.7.1. No one disputes the Project site is an area "in which special-status species are found or likely to occur or where the presence of species can be reasonably inferred." Thus, under this general plan provision, the City had to "require

mitigation of impacts to those species that *ensure* that the project does not contribute to the decline of the affected species populations in the region to the extent that their decline would impact the viability of the regional population." In addition, the required mitigation was to "be designed by the City *in coordination with* the U.S. Fish and Wildlife Service (USFWS) and the California Department of Fish and Game (CDFG)."

Did the City "require mitigation of impacts" to the special-status species found or likely to occur on the Project site? Unquestionably it did; the mitigation measures the City required have been discussed extensively above. That left two questions for the City in determining whether the Project was consistent with Action NR.1.7.1: (1) was the required mitigation sufficient to ensure the Project did "not contribute to the decline of the affected species populations in the region to the extent that their decline would impact the viability of the regional population," and (2) was the required mitigation "designed . . . *in coordination with* the U.S. Fish and Wildlife Service (USFWS) and the California Department of Fish and Game (CDFG)"?

In arguing the Project was inconsistent with Action NR.1.7.1 because the City's mitigation measures were insufficient to ensure the Project would not "contribute to the decline of the affected species populations in the region to the extent that their decline would impact the viability of the regional population," the Society asserted the Service and other agencies had "unanimously informed the City that the mitigation measures proposed in the EIR and adopted by the City *are not* adequate to support such a finding." As we have observed, however, showing evidence of a disagreement between the City and other agencies is not enough to carry the Society's burden in attacking the City's finding of consistency. To carry its burden of showing that the Project was inconsistent with the City's general plan in this regard, the Society had to show, based on *all* the evidence before the City regarding the mitigation measures the City required, that the City could not have reasonably determined those measures would prevent the Project from impacting the viability of the regional populations of vernal pool fairy and tadpole shrimp. Merely pointing to what other agencies thought on this point was not enough to carry that burden. Accordingly, this aspect of the Society's claim that the Project is inconsistent with Action NR.1.7.1 in the City's general plan fails.

That leaves us with the Society's challenge to the consistency of the Project with the provision in Action NR.1.7.1 that required the mitigation to be "designed . . . 'in coordination with' the U.S. Fish and Wildlife Service (USFWS) and the California Department of Fish and Game (CDFG)." According to the Society, "The City did not coordinate with [the Service]. It approved the Project over [the Service's] repeated objections that the proposed biological resource mitigation measures were inadequate."

In response, the City argues this provision in the general plan was satisfied because the Service was "consulted and [its] views made known during the EIR process." The City argues that to "coordinate" means "to 'negotiate with others in order to work together effectively,' " and "[t]he City satisfied its obligation of trying to work together with [the Service]" by "solicit[ing], carefully consider[ing], and respond[ing] to comments from [the Service]."

The definition of "coordinate" the City cites is a valid one (see New Oxford Dict. (2001) p. 378, col. 2), but we believe that even under this definition the concept of "coordination" means more than *trying* to work together with someone else. Even under the City's definition of the word, "coordination" means negotiating with others *in order to work together effectively*. To "coordinate" is "to bring into a common action, movement, or condition"; it is synonymous with "harmonize." (Merriam-Webster's Collegiate Dict., *supra*, at p. 275, col. 1.) Indeed, the very dictionary the City cites for the definition of the word "coordinate" defines the word "coordination" as "cooperative effort resulting in an effective relationship." (New Oxford Dict., *supra*, at p. 378, col. 3.)

Although the City suggests "coordination" is synonymous with "consultation"—and therefore the City satisfied its "coordination" obligation under the general plan at the same time it satisfied its "consultation" obligation under the plan—that is not true. While the City could "consult" with the Service by soliciting and considering the Service's comments on the draft EIR, the City could not "coordinate" with the Service by simply doing those things. The City may be correct in asserting that "[c]onsultation is not a synonym for 'agreement,' " but Action NR.1.7.1 required more than "consultation" with the Service; it required "coordination," and by definition "coordination" implies some measure of cooperation that is not achieved merely by asking for and considering input or *trying* to work together. Had the City intended the obligation under Action NR.1.7.1 to be one of mere "consultation," it could have used that word, as it did in Action NR.1.1.3. The fact that it did not do so supports the conclusion that the City intended "coordination" to have a different meaning than "consultation," consistent with the dictionary definitions of those words.

That the word "coordination," as used in the City's general plan, implies a measure of cooperation is apparent not only from the dictionary definition of the word, but also from the context in which the word is used in the plan. Essentially, the plan provides that when development projects will occur in areas where special-status species are found or likely to occur, the City will require mitigation for the impacts of development on those species, and the mitigation will be designed in coordination with the Service. Cooperation is important in this context—particularly with regard to this Project—because,

as the City admitted in its response to the Service's comments on the draft EIR, "If the City approves the project, the applicants still need to obtain Clean Water Act permits from the Corps . . . , which will consult with the . . . Service, pursuant to Section 7 of the Endangered Species Act, as part of its process of considering those permits." Because the Service will have a role in the issuance of later permits for the Project, "coordination" between the City and the Service in designing mitigation for the impacts of the Project on special-status species like the vernal pool fairy and tadpole shrimp serves the laudable purpose of minimizing the chance the City will approve the Project, only to have later permits for the Project denied because of the Service's disapproval of the mitigation measures the City imposed on the Project in the absence of "coordination" with the Service.

Unlike the City, we do not read this "coordination" requirement as "requir[ing] the City to *subordinate* itself to state and federal agencies by implementing their comments and taking their direction." At the same time, however, we cannot reasonably deem this "coordination" requirement satisfied by the mere solicitation and rejection of input from the agencies with which the City is required to coordinate the design of mitigation measures for the Project. Although our standard of review on the interpretation of the general plan is highly deferential, "deference is not abdication." (*People v. McDonald* (1984) 37 Cal.3d 351, 377 [208 Cal.Rptr. 236, 690 P.2d 709].) Because we conclude the City's interpretation of the word "coordination" in this context is unreasonable, deference to the City's interpretation of its general plan in this instance is unwarranted. Thus, we conclude the trial court ultimately did not err in determining the City violated the Planning and Zoning Law because the Project is inconsistent with Action NR.1.7.1 in the City's general plan.

III

*Conclusion*

For the reasons stated above, the trial court erred in concluding the certification of the Project EIR and the approval of the Project violated CEQA. The trial court did not err in concluding the approval of the Project violated the Planning and Zoning Law, but the only valid basis for this conclusion is that the City could not have reasonably determined the mitigation for impacts of the Project on the vernal pool fairy and tadpole shrimp was designed "in coordination" with the Service. Because our conclusion will require the trial court to direct the issuance of a different writ of mandate to the City, the present judgment in favor of the Society must be reversed. We leave it to the trial court in the first instance to determine the terms of the judgment to be entered on remand consistent with this opinion.

## DISPOSITION

The judgment is reversed and the trial court is instructed to enter, consistent with this opinion, a new and different judgment granting in part and denying in part the Society's petition for writ of mandate. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a).)

Nicholson, Acting P. J., and Hull, J., concurred.

A petition for a rehearing was denied April 13, 2009, and the petition of appellant California Native Plant Society for review by the Supreme Court was denied July 15, 2009, S172621. George, C. J., did not participate therein. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.