Filed 8/30/21  Environmental Council of Sacramento v. City of Elk Grove CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| ENVIRONMENTAL COUNCIL OF SACRAMENTO et al., | C089384 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34201880002937CUWMGDS) |
| v. | |
| CITY OF ELK GROVE et al., | |
| Defendants and Respondents; | |
| SOUZA ELK GROVE, LLC, et al., | |
| Real Parties in Interest and Respondents. | |

The California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) generally requires public agencies to prepare a detailed statement of environmental impacts, known as an environmental impact report or EIR, before approving projects that may have a significant effect on the environment.  After an

1

agency has finalized an EIR for a proposed project, that is typically the end of the environmental review process under CEQA. But not always. Agencies at times propose changes to a project after an EIR has been prepared and, relevant here, when those changes are "[s]ubstantial" and require "major revisions" of the EIR, the agency must then prepare a subsequent or supplemental EIR providing detailed information about the potential environmental impacts of the proposed changes. But absent those circumstances, an agency generally may change its EIR through an addendum.

In this case, the City of Elk Grove (the City) proposed modifying an EIR it had prepared for the development of 1,200 acres of largely agricultural lands. In the initial EIR, the City concluded that the proposed development would destroy foraging habitat for the Swainson's hawk, a species listed as threatened under California's Endangered Species Act. To mitigate the impact, the City required the developer to acquire, before any site disturbance, replacement foraging habitat that the California Department of Fish and Wildlife found suitable. But years later, the developer asked the City to modify the EIR to add an alternative mitigation option that would allow it to acquire replacement foraging habitat at a ranch known as the Van Vleck Ranch. The City agreed to the request and, in an addendum, it found the proposed change would not trigger the need to prepare a subsequent or supplemental EIR.

Appellants Environmental Council of Sacramento, Sierra Club, and Friend of Swainson's Hawk (collectively Environmental Council) afterward challenged that decision, alleging the City's decision was not supported by substantial evidence. But the trial court disagreed, and, on appeal, we now affirm. At bottom, Environmental Council's arguments show that different experts disagreed about the mitigation value of the Van Vleck Ranch site. One appeared to find the site inadequate. Another found differently. But a disagreement among experts is not reason, in itself, to conclude an agency's decision is not supported by substantial evidence. We thus reject

2

Environmental Council's challenge to the City's decision and affirm the trial court's judgment in the City's favor.

BACKGROUND

I

*Legal Background*

CEQA serves "to ensure that public agencies will consider the environmental consequences of discretionary projects they propose to carry out or approve." (*Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 481, 488.) To that end, absent an exemption, an agency proposing to carry out or approve a project generally must conduct an initial study to determine "if the project may have a significant effect on the environment." (CEQA Guidelines,[1] § 15063, subd. (a).)

Depending on the initial study's findings, the agency must then prepare either an EIR, a mitigated negative declaration, or a negative declaration. If "there is no substantial evidence that the project or any of its aspects may cause a significant effect on the environment," the agency need only prepare a negative declaration that "briefly describ[es] the reasons that a proposed project . . . will not have a significant effect on the environment." (CEQA Guidelines, §§ 15063, subd. (b)(2), 15371.) If substantial evidence shows the project may in fact have a significant environmental effect, but the project applicant agrees to changes that would avoid or mitigate them to an insignificant level, then the agency may instead prepare a mitigated negative declaration. (CEQA Guidelines, § 15070, subd. (b).) And if substantial evidence shows the project may have a significant environmental effect and a mitigated negative declaration is inappropriate, then the agency must prepare an EIR providing detailed information about the project's

---

[1] California Code of Regulations, title 14, sections 15000-15387 are commonly referred to as the CEQA Guidelines. We use that shorthand here.

3

potential environmental impacts.  (Pub. Resources Code, §§ 21100 [state agency requirements], 21151 [local agency requirements], 21061 [defining an EIR].)

For many projects, the preparation of an EIR "is the end of the environmental review process.  But like all things in life, project plans are subject to change.  When such changes occur, [Public Resources Code] section 21166 provides that 'no subsequent or supplemental environmental impact report shall be required' unless at least one or more of the following occurs: (1) '[s]ubstantial changes are proposed in the project which will require major revisions of the environmental impact report,' (2) there are '[s]ubstantial changes' to the project's circumstances that will require major revisions to the EIR, or (3) new information becomes available."  (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 945 (*Friends*); see also CEQA Guidelines, §§ 15162, subd. (a) [describing when a subsequent or supplemental EIR is required], 15163 [describing the difference between a subsequent and a supplemental EIR].)

Our focus in this case is on the first of these circumstances calling for a subsequent or supplemental EIR — that is, when "[s]ubstantial changes are proposed in the project which will require major revisions of the environmental impact report."  Agencies may propose project changes requiring revisions to an EIR, including an EIR's mitigation measures, for a variety of reasons.  In some situations, for example, an adopted mitigation measure for a project may prove to be impracticable or unworkable.  In other situations, as another example, an agency and the project applicant may find a new mitigation measure would be superior to the one initially adopted.  Each of these scenarios, and others more still, may lead an agency to decide to modify a mitigation measure in its EIR.

But only some of these changes, as Public Resources Code section 21166 shows, require the preparation of a subsequent or supplemental EIR.  Should an agency's proposed change to a mitigation measure be "[s]ubstantial" and "require major revisions

4

of the [EIR]," then, per Public Resources Code section 21166, the agency must prepare a subsequent or supplemental EIR. But should an agency's proposed change fall short of "requir[ing] major revisions of the [EIR]," then the agency need only prepare an addendum to the EIR. To proceed by an addendum, the agency must determine, based on substantial evidence in the record, "that project changes will not require 'major revisions' to its initial environmental document, such that no subsequent or supplemental EIR is required." (*Friends*, *supra*, 1 Cal.5th at p. 953; see also CEQA Guidelines, § 15164, subd. (e) [an agency that proposes to change an EIR through an addendum should include a "brief explanation of the decision not to prepare a subsequent EIR," which "must be supported by substantial evidence"].)

## II

### *Factual Background*

In 2014, the City certified an EIR for a project titled the Southeast Policy Area Strategic Plan (the Southeast Plan). As approved, the project allows for the future development of about 1,200 acres that currently consists largely of agricultural and undeveloped lands. The City certified the final EIR for the project in 2014.

According to the EIR, implementation of the Southeast Plan would have a potentially significant impact on the Swainson's hawk — a species that is listed as threatened under California's Endangered Species Act. (See California Department of Fish and Wildlife, *State and Federally Listed Endangered and Threatened Animals of California* (July 6, 2021), p. 16 <https://nrm.dfg.ca.gov/FileHandler.ashx?DocumentID=109405&inline> [as of Aug. 30, 2021], archived at <https://perma.cc/Y98J-Y8ZJ> [listing the Swainson's hawk as a threatened species].) In particular, the EIR found, the project would result in a significant loss of foraging habitat for the hawk. To mitigate that loss, the EIR required any developer of the project lands to "acquire conservation easements or other instruments to preserve suitable foraging habitat for the Swainson's hawk, as determined by the

California Department of Fish and [Wildlife]" (DFW). This habitat, the EIR stated, would need to "be governed by a one-to-one (1:1) mitigation ratio for each acre developed at the project site" and be located at a location "acceptable to the City and to [DFW]."

In 2017, several years after the City approved the Southeast Plan and certified the EIR, a developer sought to develop over 900 acres of the 1,200 acres subject to the Southeast Plan. Because about 895 of these acres consists of Swainson's hawk foraging habitat, the EIR required the developer, before any site disturbance, "to preserve [895 acres of] suitable foraging habitat for the Swainson's hawk, as determined by [DFW]." But rather than pursue this mitigation option, the developer instead asked the City to amend the EIR. In particular, the developer asked the City to modify the EIR to add an alternative mitigation option that would allow the developer to acquire mitigation lands on the Van Vleck Ranch.

City staff afterward, with the assistance of consulting firm Ascent Environmental, drafted an addendum to accomplish the developer's desired change and recommended that the City's council approve a resolution adopting the addendum. City staff reasoned that an addendum, rather than a supplemental or subsequent EIR, was appropriate because, among other things, the modification would not cause "an increase in severity of environmental impacts."

Under the proposed modification, the EIR would allow the developer to mitigate for the loss of the 895 acres of Swainson's hawk foraging habitat in one of two ways. Under option one, as also allowed in the initial EIR, the developer could "acquire conservation easements or other instruments to preserve [895 acres of] suitable foraging habitat for the Swainson's hawk, as determined by [DFW]." Under option two, the developer could instead acquire a conservation easement to preserve 895 acres of suitable foraging habitat on the Van Vleck Ranch — even if DFW found these lands unsuitable. This option, should the developer pursue it, would also involve certain "habitat

6

enhancements," including, for example, (1) the conversion of 50 acres of irrigated pasture on the Van Vleck Ranch (considered moderate-value foraging habitat) to alfalfa (considered high-value foraging habitat) and (2) the "[p]lanting of 20 cottonwood trees on the Van Vleck Ranch to enhance/create nesting habitat."

Before City council considered the modification, the City notified DFW and the public about the proposed modification and scheduled a public hearing. DFW, as is its practice, evaluated the proposed change under nine criteria. In its view, the modification was consistent with six of its criteria because, among other things, the proposed mitigation lands would support foraging habitat for the hawk, "be connected to other protected habitat thereby contributing to larger habitat preserve," "be outside areas identified for urban growth," and "be managed in perpetuity as foraging habitat." But, DFW believed, the modification would be inconsistent with its remaining three criteria. First, it found, the Van Vleck Ranch mitigation lands, at 18 miles from the project site, would "not [be] within a biologically supportable distance from the impact site." According to DFW, "many biological consultants and mitigation bankers have expressed that this distance is, or should be[,] 10 miles." Second, DFW stated, the Van Vleck Ranch mitigation lands would provide inferior foraging habitat compared to the "impact site." It wrote: "The majority of the proposed Van Vleck Ranch mitigation site is characterized by annual grassland with oak woodland, whereas the impact site contains a mix of alfalfa and other semi-perennial hays, hayfields, irrigated cropland and irrigated pasture. Therefore, the proposed Van Vleck Ranch mitigation site would not be able to support the larger population density that is present near the Project site." Third, DFW asserted, the Van Vleck Ranch mitigation site would be "in direct competition with," and

7

potentially "have an unfair advantage" over, the neighboring Van Vleck Ranch mitigation bank, which was established "to sell [Swainson's hawk] mitigation credits."[2]

Environmental Council offered a similar assessment of the modified mitigation measure. In a comment letter, it too expressed concerns about the proposed change, alleging, among other things, that the foraging habitat at the Van Vleck Ranch "is of a lower quality and character" and too "distant from the area of impact."

In written responses, City staff acknowledged DFW's and Environmental Council's concerns but continued to recommend approval of the modified mitigation measure. Addressing first DFW's point about the ranch's distance from the project, the City agreed that "mitigation within 10 miles of the impacted site is commonly recommended." But it found that "the preservation of foraging habitat at the Van Vleck Ranch will benefit the regional [Swainson's hawk] population as a whole" and preserve "historic grassland foraging habitat," which DFW has identified as a "key factor[]" for protecting the species. The City also found there were no comparable lands lying within 10 miles of the project site. Although the City noted, it could find some mitigation lands within 10 miles of the project, these lands totaled only 709 acres (short of the 895 acres required), covered four distinct parcels (instead of, as is preferred, a single contiguous parcel), cost far more than the cost of mitigation at the Van Vleck Ranch (nearly four times as much), and were surrounded by agriculture lands "with uncertain long-term habitat value as a result of changing land use and farming practices" (while the lands surrounding the Van Vleck Ranch mitigation site are largely protected lands). Finally,

---

[2]    According to Environmental Council, DFW also found the project would be inconsistent with one more of its nine criteria. Apart from the already mentioned criteria, Environmental Council claims DFW also "found the modification conflicts with the [Swainson's hawk] conservation strategy under the proposed South Sacramento County Habitat Conservation Plan" (SSCCP). Environmental Council misstates the record. DFW expressly found "the site will not conflict with the SSCCP."

8

the City questioned DFW's finding that mitigation lands must be no farther than 10 miles distant to be biologically supportable. Although, it said, "mitigation within 10 miles of the impacted site is commonly recommended, the 10-mile distance is not a requirement of the existing California Fish and Game Code or formal policy or guidance issued by []DFW."

Considering next DFW's comment about the inferior quality of the Van Vleck Ranch mitigation lands, the City acknowledged that the Van Vleck Ranch lands would not support the same breeding density as the project site in the short term. But in light of other considerations, it nonetheless believed the Van Vleck Ranch lands "contain equal or better foraging habitat as compared with the habitat impact site." It reasoned that these lands provide "stable nesting and foraging conditions" and are adjacent to other protected lands that also provide foraging habitat for the Swainson's hawk. It also noted that 50 acres of conserved lands near the Van Vleck Ranch mitigation site would be converted to alfalfa "to provide increased prey availability" for the hawk.

The City turned last to DFW's comment that the Van Vleck Ranch mitigation lands would directly compete with the nearby Van Vleck Ranch mitigation bank. The City indicated that, for its purposes at least, the proposed mitigation lands and the Van Vleck Ranch mitigation bank were not competing options. Because, the City said, the project site sits outside the mitigation bank's service area, it is not even an option for the City. The City added that no existing mitigation bank that could serve the project has the required 895 mitigation credits for the project site.

The developer's consulting biologist, Jim Estep, generally agreed with the City's conclusions. Estep, who has researched the Swainson's hawk in the Sacramento Valley and throughout California for over 30 years, acknowledged that "[]DFW typically uses a maximum distance of 10 miles between the impact and mitigation site." But he testified that "there isn't any real good science behind that number at all" and said that Swainson's hawks have been found to forage out to 20 miles. Estep also acknowledged that the Van

9

Vleck Ranch mitigation lands would not, at least in the short run, support the same level of breeding density as in the vicinity of the project site. On that topic, he wrote, the Van Vleck Ranch mitigation lands consists primarily of "grassland habitat" that provides moderate-value foraging habit for the Swainson's hawk, while the project site currently consists primarily of lands that provide moderate- to high-value foraging habitat. But considering other favorable attributes of the ranch, he ultimately found the value of the foraging habitat at the Van Vleck Ranch site is "[s]imilar to the value of the impact area" and, compared to the impact site, said "it's definitely a good tradeoff."

Following a public hearing, the City's council adopted a resolution approving the addendum to the EIR. According to the City's resolution, the proposed modification would "provide[] other viable options for mitigating the loss of foraging habitat at a 1:1 ratio," would "not change the effectiveness of the EIR's Mitigation Measures," and would not cause "an increase in severity of environmental impacts." Those considerations in mind, the City found it unnecessary to prepare a subsequent or supplemental EIR.

Shortly after the City approved the addendum, Environmental Council filed a petition for writ of mandate against the City and the City's council. According to Environmental Council, the City's "approval of an Addendum . . . to allow for the option to mitigate for the loss of Swainson's hawk foraging habitat at the Van Vleck Ranch is not supported by substantial evidence." In support, it principally argued that (1) the City's "[a]llowing for mitigation beyond the 10[ ]miles from the Project's impacts to the hawk is not supported by [the] record" and (2) the City's conclusion that the Van Vleck Ranch offers adequate replacement foraging habitat is also not supported by the record.

The trial court denied Environmental Council's petition. Addressing first Environmental Council's argument concerning the inferior quality of the ranch lands, it accepted that, in DFW's view, "the Van Vleck Ranch would not be able to support the larger population density of Swainson's hawks present near the Project site, because the

10

foraging habitat at Van Vleck Ranch . . . supports less prey." But even so, it found, "[d]isagreement from other agencies about the significance of impacts to a project, in and of itself, is not a basis for overturning the City's decision." Turning next to the distance of the ranch, the court acknowledged the Van Vleck Ranch was not, in DFW's view, " 'a biologically supportable distance from the impact site,' as it was 18 miles from the [site], rather than its preferred standard of 10 miles from the project site." But, the court wrote, the developer's expert's "testimony describes the origin of the ten-mile limit, explains that the number is not dispositive and states that Swainson's hawks can forage for longer distances — up to 20 miles." That testimony, the court found, was enough to show that "the Van Vleck Ranch is located within a biologically supportable distance from the impact site." And, the court added, DFW's contrary position appears to be "no more than 'unsubstantiated opinion or narrative', which does not constitute 'substantial evidence.' " The court afterward entered judgment in the City's favor.

Environmental Council timely appealed.

DISCUSSION

Environmental Council, for largely the same reasons it argued at the trial level, contends the City's approval of the addendum to the EIR is not supported by substantial evidence. It reasons that (1) "[a]llowing for mitigation beyond the 10[ ]miles from the Project's impacts to the hawk is not supported by [the] record," and (2) because the record shows that the Van Vleck Ranch does not support the same density of Swainson's hawk nests as in the project area, "substantial evidence does not support a finding that the project will be mitigated." Like the trial court, however, we find Environmental Council's arguments fall short.

We start with Environmental Council's assertion that "[a]llowing for mitigation beyond the 10[ ]miles from the Project's impacts to the hawk is not supported by [the] record." To support the claim, Environmental Council notes that the City's own website previously said mitigation lands would "ideal[ly]" be located within 10 miles of a project

11

site.  It also notes that DFW wrote that the Van Vleck Ranch is too distant because it is not within 10 miles of the project site.  According to DFW, again, the Van Vleck Ranch mitigation lands, at 18 miles from the project site, would "not [be] within a biologically supportable distance from the impact site."

But neither of these contentions require reversal.  First, although the City acknowledges that its website once said that mitigation lands should "ideal[ly]" be located within 10 miles of a project site, a mitigation measure is not deficient simply because it is not "ideal."  The City, after all, had no need to adopt a mitigation measure that would avoid *all* potential impacts, as would be true of an ideal mitigation measure.  It only needed to adopt a measure that would reduce potential impacts to a less than significant level — or, if that were not possible, to adopt a statement of overriding considerations.  (Pub. Resources Code, § 21081; see also *Save Panoche Valley v. San Benito County* (2013) 217 Cal.App.4th 503, 528 [" '[M]itigation need not account for every square foot of impacted habitat to be adequate.  What matters is that the unmitigated impact is no longer significant.' "].)

Second, although true that DFW believed the Van Vleck Ranch too distant from the impact site, another Swainson's hawk expert, Estep, found differently.  Estep, again, is a biologist who has researched the Swainson's hawk for over 30 years.  In his view, the Swainson's hawk's foraging range is broader than DFW's preferred 10-mile rule suggests.  According to Estep, "the ten-mile thing" was initially used "to determine whether or not you would mitigate at all.  If you ha[d] a hawk nesting within ten miles of your project, then you would be required to mitigate."  But "if you had a hawk that was 10.5 miles [distant], you wouldn't be required to mitigate.  So that was sort of the guidelines that were used."  But, he stated, this principle "somehow . . . got morphed into this issue of mitigation and where to mitigate," even though "we had birds actually foraging out to 20 miles" — a distance greater than the 18 miles here.  Considering this

12

background, Estep said, "there isn't any real good science behind that [10-mile] number at all" and "the distance is not an issue."

A former director of DFW, Ryan Broderick, echoed some of these sentiments. He too appeared to believe that 10 miles was a somewhat arbitrary number. In his telling, DFW's "ten-mile radius" preference "has been left on the books" because, "from a pragmatic standpoint," "putting the energy and time into trying to determine what is the right size, what is the perfect algorithm, is really beyond the capacity of most everyone at this point."

Considering all the expert testimony, we cannot say, as Environmental Council would have us, that "[a]llowing for mitigation beyond the 10[ ]miles from the Project's impacts to the hawk is not supported by [the] record." We can say only that we have a disagreement among experts on this topic. One expert, DFW, said mitigation lands should be located within 10 miles of the impact site. Another expert, Estep, said mitigation lands could be located well beyond 10 miles — as far, it appears, 20 miles distant. And a third person, a former DFW director, appeared to agree that DFW's reliance on a 10-mile radius is somewhat arbitrary, though he declined to settle on any better figure.

Although this testimony may reflect different views about the appropriate distance of mitigation lands, a disagreement among experts is not reason, in itself, to conclude an agency's decision is not supported by substantial evidence. As this court has previously said, "[p]ointing to evidence of a disagreement with other agencies is not enough to carry the burden of showing a lack of substantial evidence to support the City's finding." (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 626 (*California Native Plant Society*).) And as our Supreme Court long ago explained, "[a] court may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. [Citation.] A court's task is not to weigh conflicting evidence and determine who has the better argument

13

when the dispute is whether adverse effects have been mitigated or could be better mitigated. We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 393; see also CEQA Guidelines, § 15384, subd. (a) [" '[s]ubstantial evidence' . . . means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached"].)

Environmental Council, in its opening brief, never confronts this conflicting expert testimony. It instead only briefly attempts to do so in its reply brief, stating there that Estep's comments "constitute unsubstantiated opinion as he provides no citations to studies or documents that support this opinion." But we are aware of no rule that renders an expert's opinion "unsubstantiated" unless explicitly supported by "citations to studies or documents," and Environmental Council, for its part, offers no legal authority supporting its position. We thus reject Environmental Council's belatedly made and little explained argument. (See *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 ["When an appellant . . . asserts [a point] but fails to support it with reasoned argument and citations to authority, we treat the point as waived"]; *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [arguments raised for the first time in a reply brief, without good cause, are forfeited].)

We turn next to Environmental Council's contention that because the record shows that the Van Vleck Ranch does not support the same density of Swainson's hawk nests as in the project area, "substantial evidence does not support a finding that the project will be mitigated." The premise of Environmental Council's argument, we agree, is generally accurate. DFW, for example, stated that "the proposed Van Vleck Ranch mitigation site would not be able to support the larger population density that is present near the Project site." And Estep largely agreed on this point, acknowledging that the

14

foraging habitat around the project site could currently support higher breeding densities, though he questioned whether that would be true in the long run. The Van Vleck Ranch mitigation lands, he wrote, consists primarily of "grassland habitat" that provides moderate-value foraging habit for the Swainson's hawk, but the project site consists primarily of lands that provide moderate- to high-value foraging habitat. About 639 acres of the project site, he explained, consists of various types of habitats with moderate foraging value and about 256 of these acres consists of alfalfa and other semi-perennial hays with high foraging value. The Swainson's hawk, Estep noted, is historically "a grassland species" but certain crops, like alfalfa, can support artificially elevated breeding densities because of the higher "availability and abundance of prey."

But although Estep acknowledged this one comparative shortcoming of the Van Vleck Ranch lands, considering other favorable attributes of the ranch lands, he ultimately concluded that "it's definitely a good tradeoff." Estep, again, believed the project site could support a higher breeding density than the Van Vleck Ranch site because it currently consists, in large part, of certain irrigated crops that tend to have abundant and accessible rodent prey populations. But he also found this advantage potentially fleeting. Although he noted, some types of irrigated croplands (like alfalfa) could support higher breeding densities, and although large parts of the project site and neighboring areas are currently planted in these crops, he said changing economic incentives have increasingly resulted in the conversation of these beneficial crops to other crops (like vineyards and orchards) that are unsuitable for Swainson's hawk foraging habitat. Considering these changes, along with issues raised by water availability, Estep said that "[t]he dependency on cultivated habitats . . . has potential negative implications" and concluded that "the long-term sustainability of irrigated lands functioning as habitat for Swainson's hawk in the Central Valley is increasingly questionable."

In contrast to these cropland habitats, Estep found that grassland habitats, like those present on the Van Vleck Ranch, offer "more ecological[ly] stable" habitats that

15

"are really essential to maintaining the population over the long-term as we continue to see this change in ag. patterns." The Van Vleck Ranch site, he wrote, provides a "suitable foraging habitat" that is "moderately grazed and maintained in a condition that promotes good prey availability and accessibility for foraging Swainson's hawks." The ranch site, he added, is also adjacent to other protected lands that provide Swainson's hawk foraging habitat, increasing its "ecological value." Taking into account the various competing considerations, Estep ultimately concluded that the Van Vleck Ranch site is "[s]imilar to the value of the impact area," offers "many, many components that are very, very important to this species," and, compared to the impact site, is "definitely a good tradeoff."

Broderick, the former DFW director, appeared to find similarly. He too testified that crops in the region of the project site have transitioned over the years from row crops (which can serve as suitable foraging habitat) to vineyards and orchards (which are not considered suitable foraging habitat). And he too spoke favorably of the Van Vleck Ranch, saying: "To have the size of the Van Vleck Ranch that can actually be holistically managed and is close enough to other major conservation investments that have been done through wildlife conservation boards and supportive nonprofits I think is definitely a better way to go for long-term sustainability."

Ultimately, then, as with the discussion about the appropriate distance for a mitigation site, we are left with a disagreement among experts. One expert, DFW, questioned the value of the Van Vleck Ranch as a mitigation site. But another expert, Estep, found the value of the foraging habitat at the ranch is "[s]imilar to the value of the impact area" and, compared to the impact site, said "it's definitely a good tradeoff." DFW might have found differently, but, again, a disagreement among experts is not reason in itself to conclude an agency's decision is not supported by substantial evidence. (*California Native Plant Society*, *supra*, 172 Cal.App.4th at p. 626.)

16

Environmental Council, in alleging the City's findings on this point are not supported by substantial evidence, never acknowledges Estep's ultimate conclusions about the value of the Van Vleck Ranch site. It never acknowledges, for example, Estep's conclusion that the value of the foraging habitat at the Van Vleck Ranch site is "[s]imilar to the value of the impact area." Environmental Council instead focuses principally on certain portions of Estep's reports that appear more favorable to its position — arguably forfeiting its contention as a result. (See *Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408 [an appellant "who cites and discusses only evidence in his favor fails to demonstrate any error and waives the contention that the evidence is insufficient to support the judgment"].) Environmental Council notes, for example, that Estep wrote in a 2007 report that the lands between "Interstate 5 on the west and Clay Station Road" (where the project site is located) are "considered the highest priority target area for conservation," while the lands "east of Clay Station Road" (where the Van Vleck Ranch is located) are "less appropriate for conservation purposes." But generalities about the conservation value of the lands "east of Clay Station Road" tell us little about the conservation value of a particular parcel in that region. And focusing on the particular parcel relevant here, the Van Vleck Ranch, Estep, again, concluded the site is "[s]imilar to the value of the impact area" and "definitely a good tradeoff." In this testimony, Estep may not have explicitly said that acquiring replacement foraging habitat at the Van Vleck Ranch would mitigate potential impacts to the Swainson's hawk to an insignificant level — something Environmental Council appears to find significant — but we find his testimony sufficiently evinces the same sentiment.

Finally, offering a new type of argument, Environmental Council briefly suggests that the City considered the project's impacts on a hypothetical "historic pre-agricultural condition" rather than its impacts on the current environmental setting. Before addressing the point, we begin with a little legal background. An agency must, in its EIR, "include a description of the physical environmental conditions in the vicinity of the

17

project," which is referred to as the project's "environmental setting." (CEQA Guidelines, § 15125, subd. (a).) The agency must normally then use this description of the existing environmental setting as the " 'baseline' against which predicted effects [of the project] can be described and quantified." (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 447.) In Environmental Council's apparent view, however, rather than evaluate the project's impacts on the existing environmental setting, Estep (and the City) instead improperly evaluated the project's impacts on "the historic pre-agricultural condition." We reject the argument. As the City notes, because no party ever raised this alleged issue at the administrative level, Environmental Council cannot now raise it on appeal. (See Pub. Resources Code, § 21177, subd. (a); *California Native Plant Society*, *supra*, 172 Cal.App.4th at p. 615 [" ' "Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action." ' "].)

In the end, Environmental Council's several arguments principally show that different experts disagreed about the mitigation value of the Van Vleck Ranch site. DFW appeared to find the site inadequate. Estep found differently. But again, a party does not show that an agency's findings are inadequate simply by pointing to evidence of a disagreement among experts. (*California Native Plant Society*, *supra*, 172 Cal.App.4th at p. 626.) We thus find that Environmental Council has failed to carry its burden to show that a lack of substantial evidence supported the City's decision to proceed by an addendum rather than a subsequent or supplemental EIR.

## DISPOSITION

The judgment is affirmed.  Respondents are entitled to recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)

                                         _____/s/_____

                                         BLEASE, J.

We concur:

_____/s/_____
RAYE, P. J.

_____/s/_____
MAURO, J.

19